Grant E. BROWN et al., Plaintiffs,

v.

Clarence L. ANDERSON, Commissioner of Fish & Game for Alaska; Roy S. Selfridge, Chairman; Dick Janson, Jr., Arnold Brower, Oscar Dyson, Eugene V. Miller, Robert I. Martin, Howard G. Romig and Gordon Jensen, Members of the Alaska Board of Fish and Game, Defendants.

No. J-6-61.

United States District Court
D. Alaska,
at Juneau.

Feb. 12, 1962.

Seth W. Morrison, of Allen, DeGarmo & Leedy, Seattle, Wash., and R. Boochever, of Faulkner, Banfield, Boochever & Doogan, Juneau, Alaska, for plaintiffs.

Ralph E. Moody, Atty. Gen. of Alaska, and Avrum M. Gross, Asst. Atty. Gen., for defendants.

Before BONE, Circuit Judge, and POWELL and HODGE, District Judges.

POWELL, District Judge.

This case involves the regulation of salmon fishing in Alaska. Plaintiffs bring this diversity action seeking a declaratory judgment and injunction under 28 U.S.C.A. § 2201. They challenge the constitutionality of Chapter 62 of the Alaska Session Laws of 1961. It is claimed to violate the privileges and immunities and the commerce clauses of the Federal Constitution and corresponding provisions of the Alaska Constitution. This Three-Judge District Court has been convened as provided in Secs. 2281 and 2284 to pass on the questions presented.

The defendants' Motion to Dismiss was first presented. This Court reserved decision on that motion. The parties then submitted the case on the merits. All questions of fact were resolved by stipulation.

Plaintiffs are all nonresidents of Alaska. Some are individual fishermen, some owners and operators of fishing vessels and others are cannery operators. The defendants are the Commissioner and all of the members of the Alaska Board of Fish and Game.

The 1961 Legislature of the State of Alaska enacted Chapter 62 of the Session Laws, entitled "Emergency Commercial Fishing Measures."[1] Defend-

1. "AN ACT
Relating to the fish and game resources of Alaska; amending Ch. 94, SLA 1959; and providing for an effective date.
"Be it enacted by the Legislature of the State of Alaska:
"Section 1. Ch. 94, SLA 1959 is amended by adding a new Article III A to read:
"Article III A
"Emergency Commercial Fishing Measures
"Section 1. Statement of Purpose. The legislature is aware that in many areas of Alaska the entire economy and very existence of communities depend upon the annual salmon run. The legislature is also aware of the fact that in years of poor salmon runs, competitive pressure has resulted in Alaska resident fishermen not being able to make even a minimum catch, such as is necessary for a basic standard of living. Further, there is no alternative means of earning a living for most residents of these areas. While the state is forbidden from creating an economic advantage for its residents under normal circumstances, it is both a practical and moral responsibility of the state to provide for its citizens in situations where economic competition will create community destitution. Therefore, to provide for the welfare of its people in extreme circumstances, the legislature hereby adopts the following emergency measures.
"Sec. 2. Power of Board of Fish and Game to Limit Fishing. a. The board may establish, for each salmon registration area or district in the state, an optimum number for the total run of salmon found within the registration area or district.
"b. Whenever the board determines that the yearly run of salmon in any one registration area or district will be substantially less than the optimum run, and that under anticipated fishing conditions Alaska residents licensed for the area or district will not catch sufficient fish to sustain them for the year, the board may, with the consent of the local advisory board or boards, promulgate regulations temporarily closing the area or district to fishing by all non-residents of Alaska.
"c. All regulations closing the area or district to non-residents of Alaska shall be promulgated in accordance with the Administrative Procedure Act. All hearings held on regulations closing an area or district shall be held in the area or district that will be affected. Nothing contained herein shall limit the power of the commissioner, when circumstances so require and the conditions of this section are otherwise met, to summarily prohibit non-residents from fishing in the area or district by means of emergency orders, which shall have the force of law after field announcement by the commissioner or his authorized designee.
"d. If, at any time after the board has closed an area or district to non-resident fishermen, the board determines that (1) the run is larger than anticipated, such that the closure is no longer necessary to accomplish the purpose of this section; or (2) that the total number of fish taken indicates that on an average basis, each resident fisherman licensed for the area or district has taken at least 1,000 fish, the board shall

ants are vested by Alaska law with the duty to enforce all the fishing laws of the State of Alaska, including Chapter 62, and with the authority to make and enforce rules and regulations governing fish and game there.

Chapter 62 grants the Commissioner and the Board authority to close any registration area or district to commercial fishing by all nonresidents of Alaska, while granting that right to Alaska residents.

The Board and the Commissioner each has authority to promulgate rules and regulations governing the fishing operations which have the force and effect of law. Violations may be punished by criminal sanctions and forfeiture of vessels and gear.

Salmon are migrating, free-swimming fish which are caught in the marginal seas of Alaska. Both resident and nonresident commercial fishermen catch and transport them to Alaska canneries for packing. At the end of the season the pack is shipped in interstate commerce for sale throughout the United States. Only a negligible portion is retained in Alaska for sale or consumption.

The Alaska marginal waters are divided into ten general areas. Each has specified geographical boundaries. The areas are generally determined by the type of salmon found there and the time of arrival of the salmon schools in the summer for final spawning. Each area has a slightly different season and each area is divided into districts and subdistricts, which in turn may be subject to differing regulations.

As to any one area the entire season is usually not open for more than approximately a month. Fishing may be permitted for an entire week, for several days, or for as few as one or two days per week, and for a designated number of

hours each day. Fishing is opened or closed on this basis by field announcements from Fish and Game Department officials in the area and depends on the size of the run which develops and the fishing effort involved. These regulations are issued to provide sufficient escapement of salmon up the streams to insure the continued existence of the salmon runs on a sustained yield basis.

Each fisherman must, prior to the season, elect the area in which he desires to fish. He may not thereafter transfer to another area unless he has permission of the Commissioner. This is granted only for good cause shown and if the transfer will not jeopardize proper conservation.

There are two principal methods of fishing. The first is gill netting and consists of two men fishing from a power driven gill net boat not over 32 feet long. The three nets used are 50 fathoms each and in them the fish are caught by their gills. The net is pulled aboard the boat, the fish extracted by hand and the net then returned to the water. The fish are sold to the cannery operators. A gill net boat and nets represents an investment of approximately $10,000.00.

The second method of fishing is by the use of a purse seine vessel. It runs from 35 to 50 feet in length and is handled by a crew of four to six men. This method involves making a circle in the water with the seine net in the location where the fish are expected. The bottom of the net is then closed (pursed) and the net lifted aboard the vessel like a bucket with the fish held within. A purse seine vessel with the usual power equipment and navigational aids represents an investment of from $50,000.00 to $75,-000.00, with net and skiff of $10,000,00 to $14,000.00 additional.

Immediately at the close of one season preparations for the next one are com-

rescind the prohibition, if the recision would be commensurate with sound conservation policies.

"e. Nothing in this section shall affect the powers of the board or department as otherwise expressed in this Act.

"Sec. 3. This Act takes effect on the day after its passage and approval or on the day it becomes law without such approval."

menced. This includes repair of nets and vessels, the arrangement for crews, the financing of the expected operation and purchase of new equipment. It requires substantial preparation for all plaintiffs to be prepared for the seasonal fishing and canning effort.

The fishermen licensed are about one-third nonresidents and two-thirds residents of Alaska. They fish side by side in the same manner without distinction as to method or technique.

The salmon migrate from the ocean into the streams of Alaska for the purpose of spawning. The salmon arrive from the ocean in large groups called "runs" during various periods of the summer. The time of arrival and the length of time during which the run is in the marginal seas where the fishing effort is conducted, varies from area to area and with the specie of salmon. The run may be as short as two or three days and last up to a week. Successive runs may extend the period during which salmon can be caught in commercial quantities for a longer period, but this is a highly variable factor.

 Defendants move to dismiss the complaint on the ground that no justiciable controversy is shown under Sec. 2201 of 28 U.S.C.A.[2]

Defendants argue there is no controversy because, (1) no regulations have been promulgated under the Act; (2) there has been no attempt at enforcement and none has been threatened, and (3) the complaint does not intimate that the circumstances will ever be such that the Act will be enforced against plaintiffs, or at all.

The argument in support of the motion is made that the application of the Act is not general or unlimited. Before it is applied in a particular area the run of salmon must drop "substantially" below an established figure termed the "optimum" run. Further, it is argued the powers are discretionary and even if the contingencies occur, neither the Board nor the Commissioner must impose restrictions. Counsel argues that until the plaintiffs, or some of them, are directly affected by the enforcement or threatened enforcement, there is no justiciable controversy.

In passing on the Motion to Dismiss we must consider the effect of the Act and its passage on the plaintiffs under the facts as alleged. They must prepare well in advance for each season's operation. They must expend large sums, acquire new gear and repair old and make contracts for labor and material. To do all this, aid from financial agencies is necessary.

The controversy arises due to the existence of the Act itself. All plaintiffs, and others similarly situated, are faced with the possible suspension of their fishing rights. It is idle to say the Act may never be enforced, as its very existence curtails freedom of contract. Its summary application by the Commissioner, which is permitted by the Act, could prevent fishing in the area or district for which preparation was made and thus waste and damage the property of a nonresident fisherman.

If the plaintiffs were required to wait until actual application of the Act to maintain this action, they might never have the determination they seek here. Assume that a closure as to nonresidents in one area was ordered under Chapter 62. The action could be heard in court only after service of process and a reasonable time to answer. The run would be over. Under defendants' argument the action could then be subject to a motion to dismiss as it would be moot.

2. "§ 2201. Creation of remedy
"In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

Under Pierce v. Society of Sisters of the Holy Names of Jesus & Mary, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), legislation of the State of Oregon was in question. A 1922 Act required that all children be sent to public schools. The effective date was postponed to 1926. In 1924 the plaintiff private school obtained an injunction restraining the officials from threatening or attempting to enforce the statute. The opinion states:

"The suits were not premature. The injury to appellees was present and very real, not a mere possibility in the remote future. If no relief had been possible prior to the effective date of the act, the injury would have become irreparable. Prevention of impending injury by unlawful action is a well recognized function of courts of equity." 268 U.S. 510, 536, 45 S.Ct. 571, 574.

To the same effect is the decision in Eastman Kodak Company v. Velveray Corporation, (S.D.N.Y.1959) 175 F. Supp. 646, 648:

"Defendant's motion for summary judgment is based on the contention that there is no actual controversy and that the court has no jurisdiction because there is no actual controversy. Defendant argues that, since the suit in the New York Supreme Court involved only defendant's common-law rights, there is no actual controversy over the registered trade-marks. However, as plaintiffs point out in their very able brief, a direct threat to sue is not necessary to the finding of an actual controversy. Dewey & Almy Chemical Co. v. American Anode, Inc., 3 Cir., 1943, 137 F.2d 68; Kobre v. Photoral Corp., D.C.S.D.N.Y.1951, 100 F.Supp. 56. As was stated in Dewey & Almy Chemical Co. v. American Anode, Inc., supra [137 F. 2d 69]—

" 'In providing the remedy of a declaratory judgment it was the Congressional intent "to avoid accru-

al of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage had accrued." E. Edelmann & Co. v. Triple-A Specialty Co., 7 Cir., 1937, 88 F.2d 852, 854. This court has emphasized that the Act should have a liberal interpretation, bearing in mind its remedial character and the legislative purpose.' "

This is not a case where there is merely a hypothetical threat of interference. United Public Workers of America (C.I.O.) v. Mitchell (1947) 330 U.S. 75, 90, 91, 67 S.Ct. 556, 91 L.Ed. 754. Nor is it one where there are abstract assertions of possible future injury, indefinite in nature and degree. Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1, 81, 81 S.Ct. 1357, 6 L.Ed.2d 625.

The question of the existence of a justiciable controversy must be decided on the peculiar facts of each case. Here as a direct result of the existence of the Act plaintiffs' activities are curtailed. There is a present actual controversy. Plaintiffs are damaged because of the existence of the Act, the uncertainty of its application and the certainty of damage in the event the Act is invoked. The Motion to Dismiss is denied.

The plaintiffs assert that Chapter 62 violates the privileges and immunities clause of the Constitution, and the equal protection clause of the Fourteenth Amendment. So far as relevant they are as follows:

Article IV, Sec. 2, Cl. 1:

"The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

Amendment XIV, Sec. 1:

" * * * No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; * * * nor deny to any person within its

jurisdiction the equal protection of the laws."

Chapter 62 authorizes the Commission and the Board to withdraw from non-residents the right to take salmon from the marginal seas in certain areas, under certain conditions. It provides further for the withdrawal of such privilege on the sole ground of nonresidency upon the happening of certain events, while permitting residents to exercise that right.

Chapter 62 provides the Board of Fish and Game may establish an optimum number of salmon for the total run found within an area or district. Whenever the Board determines the run to be substantially less than the optimum run and that Alaska residents licensed for the area will not catch sufficient fish to sustain them for the year, the Board may promulgate regulations temporarily closing the area to fishing by all non-residents of Alaska.

It further provides that the Act shall not limit the power of the Commissioner to summarily prohibit nonresidents from fishing in the area by means of emergency orders when conditions of the Act are otherwise met.

The privileges and immunities clause has been interpreted as applying to a similar situation in Toomer v. Witsell, 1948, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460. The Act there under consideration imposed a license fee of $2500.00 on nonresidents for the privilege of taking shrimp, while at the same time the fee for residents was $25.00. The Supreme Court held that the privileges and immunities clause was violated.

"Like many other constitutional provisions, the privileges and immunities clause is not an absolute. It does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States. But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them. The inquiry must also, of course, be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures. * *

"By that statute South Carolina plainly and frankly discriminates against non-residents, and the record leaves little doubt but what the discrimination is so great that its practical effect is virtually exclusionary. This the appellees do not seriously dispute. Nor do they argue that since the statute is couched in terms of residence it is outside the scope of the privileges and immunities clause, which speaks of citizens. Such an argument, we agree, would be without force in this case." (Id. 396–397, 68 S.Ct. 1162)

A yardstick to measure the reasonableness of an Act under the privileges and immunities clause is given in the same case.

"* * * The State is not without power, for example, to restrict the type of equipment used in its fisheries, to graduate license fees according to the size of the boats, or even to charge non-residents a differential which would merely compensate the State for any added enforcement burden they may impose or for any conservation expenditures from taxes which only residents pay. * * *" (Id. 398–399, 68 S.Ct. 1163)

Chapter 62 frankly discriminates against nonresidents upon the happening of certain events. There is no reasonable differentiation to bring it within the examples given in the Toomer case.

The defendants take the position that Chapter 62 is a reasonable regulation of fishing. It provides a means to prevent or alleviate the possible destitution of

the residents of the State of Alaska. They could become a burden upon the citizens of Alaska and not on nonresidents. Therefore defendants argue, the purposes as set forth in the first section of the Act make it a reasonable limitation on nonresidents.

■ There is no exception in the privileges and immunities clause providing for differentiation on the basis of the general welfare of citizens of any State. If such were the case it would be possible to couch a legislative Act in such words as to regulate almost all types of endeavor on the sole basis of welfare. We cannot agree with defendants that there is any authority to avoid the effect of the privileges and immunities clause solely under the guise of avoiding economic losses to residents. The Act cannot be sustained on the basis that this is a reasonable basis for difference in application.

In Mullaney v. Anderson (1952), 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458, the Supreme Court held invalid an Alaska license fee of $50.00 on nonresident fishermen, while a license fee of $5.00 was assessed against resident fishermen. There appeared no reasonable justification for the differential. The case of Toomer v. Witsell, supra, was cited and approved.

Defendants assert that the early case of McCready v. Virginia (1876), 94 U.S. 391, 24 L.Ed. 248, is controlling and sustains the validity of Chapter 62. The defendants argue that the fish are owned by the citizens of the State and that the State can dispose of the common property of its residents. Defendants say McCready is good law. The ownership theory was put at rest, however, in Toomer v. Witsell, supra. In his opinion Justice Vinson states as follows:

"However satisfactorily the ownership theory explains the McCready case, the very factors which make the present case distinguishable render that theory but a weak prop for the South Carolina statute. That the shrimp are migratory makes apposite Mr. Justice Holmes' statement in [State of] Missouri v. Holland, 252 U.S. 416, 434, 40 S.Ct. 382, 64 L.Ed. 641, 11 A.L.R. 984 (1920), that 'To put the claim of the State upon title is to lean upon a slender reed. Wild birds are not in the possession of anyone; and possession is the beginning of ownership.' Indeed, only fifteen years after the McCready decision, a unanimous Court indicated that the rule of that case might not apply to free-swimming fish. The fact that it is activity in the three-mile belt which the South Carolina statute regulates is of equal relevance in considering the applicability of the ownership doctrine. While United States v. [State of] California (1947), 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889, as indicated above, does not preclude all State regulation of activity in the marginal sea, the case does hold that neither the thirteen original colonies nor their successor States separately acquired 'ownership' of the three-mile belt.

"The whole ownership theory, in fact, is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource. And there is no necessary conflict between that vital policy consideration and the constitutional command that the State exercise that power, like its other powers, so as not to discriminate without reason against citizens of other States." (334 U.S. 401–402, 68 S.Ct. 1165)

For plaintiffs to be ready for the 1962 season they must already have expended substantial sums. They must at their own risk be prepared and on the fishing grounds at the start of the season. Closure on short notice or on a summary basis would completely deprive them of an opportunity to seek judicial relief.

Those licensed in the closed area or district would be unable, due to the ex-

**103**

pense and shortness of time, to transfer to another area. The result would be a loss of the total investment and preparation for the season and also the loss of the catch during that portion of the season affected.

Any discrimination must be reasonable to be sustained. Here nothing appears that will in any way justify the application of the prohibition to non-residents and not to residents. The law, Chapter 62, is a law passed by the State of Alaska which abridges the privileges and immunities of citizens of the several States.

The claim is also made that Chapter 62 violates the commerce clause of the Constitution, Article I, Sec. 8, Cl. 3. It has been held, as defendants point out, that the actual taking of fish is a local activity. State of Alaska v. Arctic Maid, (1961) 366 U.S. 199, 203, 81 S.Ct. 929, 6 L.Ed.2d 227. But that is only one step in the whole process resulting in the shipment of the finished canned product.

A substantial number of fishermen are from States other than Alaska. They move in "interstate commerce" as that term has been defined. The provisions of Chapter 62 do not prevent, but restrict that movement. Its provisions do place a burden on the movement in interstate commerce of the nonresident fishermen, who must of necessity be transported annually.

It is settled that the transportation of persons is "commerce" within the meaning of the clause. Edwards v. California (1941) 314 U.S. 160, 172, 62 S.Ct. 164, 86 L.Ed. 119.

Such was the basis of the holding in Anderson v. Mullaney, (9 Cir.) (1951) 191 F.2d 123. (Affirmed on other grounds, see Mullaney v. Anderson, 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458)

We hold that Ch. 62, SLA 1961 violates Article I, Sec. 8, Cl. 3 of the Constitution.

No discussion of applicable provisions of the Alaska Constitution appears necessary. The counterparts of the privileges and immunities clause are found there. A violation of the one has been found. The reasons and arguments apply with equal force to establish that Chapter 62 is in violation of the Alaska Constitution, particularly Article I, Secs. 1 and 7.

The plaintiffs are granted the injunction prayed for. They are entitled to a decree adjudging Chapter 62, SLA 1961 unconstitutional and void. They are directed to prepare and submit findings, conclusions and judgment.