**State of MINNESOTA, by its Attorney General Mike HATCH, and Collin Peterson, Starkey Grove, and Charles Orvik, Plaintiffs,**

v.

**John HOEVEN, in his official capacity as Governor of the State of North Dakota, and Dean C. Hildebrand, in his official capacity as Director of the North Dakota Game and Fish Department, Defendants.**

No. A1–04–021.

United States District Court, D. North Dakota, Southwestern Division.

June 8, 2005.

Harry Sieben, Jr., Sieben, Grose, Von Holtum, Mccoy & Carey, Minneapolis, MN, Lawrence W. Pry, MN Attorney General's Office, St Paul, MN, for Plaintiffs.

Dean J. Haas, Paul Craig Germolus, Attorney General's Office Civil Litigation, Bismarck, ND, for Defendants.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

HOVLAND, Chief Judge.

Before the Court is the Plaintiffs' Motion for Summary Judgment filed on January 27, 2005, and the Defendants' Motion for Summary Judgment filed on February 25, 2005. On March 3, 2005, the International Association of Fish and Wildlife Agencies filed an amicus brief in support of the Defendants' motion. On May 12, 2005, the Defendants' filed a Motion to Dismiss. For the reasons set forth below, the Court grants the Defendants' Motion for Summary Judgment, denies the Plaintiffs' Motion for Summary Judgment, and denies as moot the Defendants' Motion to Dismiss.

## I. BACKGROUND

As the Court stated in its Order of August 17, 2004, this case arises out of legislative and administrative changes North Dakota made to its hunting regulations prior to the 2003 waterfowl hunting season. Because commercial hunting of waterfowl is prohibited, this is not a commercial livelihood case. On March 10, 2004, the State of Minnesota filed suit against North Dakota's Governor, John Hoeven, and the Director of the North Dakota Game & Fish Department, Dean Hildebrand (collectively referred to as "North Dakota"), alleging that the newly adopted hunting regulations violate the Commerce Clause and the Privileges and Immunities Clause of the United States Constitution. On April 8, 2004, Minnesota amended its complaint to add three individual plaintiffs: Collin Peterson, Starkey Grove, and Charles Orvik (collectively referred to as "Minnesota"). The amended complaint added alleged violations of 42 U.S.C. § 1983. There is no allegation in the amended complaint that hunting waterfowl is a means to the plaintiffs' livelihood.

Minnesota's amended complaint sets forth five counts. Count One alleges that a July 2003 North Dakota gubernatorial proclamation[1] barring non-resident hunt-

---

1. Chapter 20.1–08 of the North Dakota Century Code sets forth the governor's powers and obligations regarding hunting proclamations.

ing during the first week of waterfowl season violates the Commerce Clause and 42 U.S.C. § 1983. Count Two alleges that a North Dakota statutory provision[2] eliminating statewide non-resident waterfowl licenses and requiring non-residents to hunt waterfowl in zones specified by the governor's proclamation violates the Commerce Clause and 42 U.S.C. § 1983. Count Three alleges that other North Dakota statutory provisions[3] requiring non-residents to obtain a small game and waterfowl license to hunt on land they own or lease violates the Commerce Clause, the Privileges and Immunities Clause, and 42 U.S.C. § 1983. Count Four alleges that a North Dakota statutory provision[4] prohibiting non-residents from hunting on Game & Fish Department controlled lands during the first seven days of the pheasant hunting season violates the Commerce Clause and 42 U.S.C. § 1983. Count Five alleges that North Dakota statutory provisions[5] imposing higher non-resident waterfowl license fees violates the Commerce Clause and 42 U.S.C. § 1983. Minnesota asks the Court to declare North Dakota's regulation of migratory waterfowl hunting unconstitutional. Minnesota also asks that North Dakota be permanently enjoined from enforcing discriminatory waterfowl hunting and licensing provisions.

On May 10, 2004, North Dakota filed a motion to dismiss under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. North Dakota asserted that Minnesota lacked standing to bring claims under the Commerce Clause, Privileges and Immunities Clause, and 42 U.S.C. § 1983 and that Minnesota's claims were barred by sovereign immunity. On August 17, 2004, the Court denied North Dakota's motion to dismiss. *Minnesota, ex rel. Hatch v. Hoeven,* 331 F.Supp.2d 1074 (D.N.D.2004).

On January 27, 2005, Minnesota filed a Motion for Summary Judgment asserting that North Dakota's waterfowl hunting regulations violated the Commerce Clause because the regulations applied to persons in interstate commerce and substantially affected interstate commerce. On February 25, 2005, North Dakota filed a Motion for Summary Judgment asserting that its waterfowl hunting regulations did not reg-

---

2. N.D.C.C. § 20.1–03–07.1 states: "Except as provided in sections 20.1–02–05, 20.1–03–07.2, and 20.1–03–07.3, a non-resident may not hunt waterfowl unless that individual first obtains a non-resident waterfowl hunting license. The non-resident waterfowl hunting license entitle the non-resident to hunt waterfowl for a period of fourteen consecutive days or any two periods of seven consecutive days each. A license authorizing the fourteen-day hunting period allows hunting in a specified waterfowl hunting zone. A license authorizing two 7–day hunting periods allows hunting in a specified zone during each period. The governor, in the governor's proclamation, shall specify various waterfowl hunting zones for which non-resident waterfowl hunting licenses will be available, and may specify the number of licenses which may be issued in each zone and the manner in which they are to be issued. A non-resident is entitled to purchase only one non-resident waterfowl hunting license per year. The fourteen-day,

seven-day, and two 7–day hunting period restrictions do not apply to non-residents hunting in Richland and Sargent Counties during the early September Canada goose season."

3. N.D.C.C. §.§ 20.1–03–03, 04(1) (allowing residents to hunt waterfowl and other small game on their own land without a hunting license throughout open season); N.D.C.C. § 20.1–03–07 (requiring non-residents to obtain a small game license).

4. N.D.C.C. § 20.1–08–04.9 states: "The governor, in the governor's proclamation, shall prohibit a non-resident from hunting for the first seven days of the pheasant season on land owned or private land enrolled by the department for the purpose of hunting or on land for which the department pays in lieu of tax payments."

5. N.D.C.C. § § 20.1–03–07.1, 12 (setting forth the licensing fees for various licenses).

ulate commerce and thus, were outside the scope of the Commerce Clause. On March 3, 2005, the International Association of Fish and Wildlife Agencies filed an amicus brief in support of North Dakota's motion. On May 12, 2005, North Dakota filed a Motion to Dismiss arguing that recently passed federal legislation supported its position that the regulation of hunting and fishing does not trigger the Commerce Clause.

## II. LEGAL ANALYSIS

It is well-established that summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Clark v. Kellogg Co.,* 205 F.3d 1079, 1082 (8th Cir.2000). A fact is "material" if it might effect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1376 (8th Cir.1996). The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact. If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the

pleadings. Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed. R.Civ.P. 56(e); *Krein v. DBA Corp.,* 327 F.3d 723, 726 (8th Cir.2003). A mere trace of evidence supporting the non-movant's position is insufficient. A non-movant must present more than a scintilla of evidence and must present specific facts to create a genuine issue of material fact for trial. *F.D.I.C. v. Bell,* 106 F.3d 258, 263 (8th Cir.1997). The facts must generate evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## A. PRIVILEGES AND IMMUNITIES CLAUSE

█ In Count Three of the amended complaint, Minnesota alleges that North Dakota statutory provisions [6] requiring non-residents to obtain a small game and waterfowl license to hunt on land they own or lease violates the Privileges and Immunities Clause and 42 U.S.C. § 1983.[7]

█ There is no doubt that citizens have a right to be free from discrimination based on their state of residence. *Saenz v. Roe,* 526 U.S. 489, 502, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999). However, this right is not absolute. *See Saenz v. Roe,* 526 U.S. 489, 502, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) (stating the Privileges and Immunities Clause provides protection for non-residents in the areas of procuring medical services and engaging in commercial activity, but that there may be substantial reasons for requiring non-residents to pay more for a hunting license or to enroll in a

6. N.D.C.C. § § 20.1–03–03, 04(1) (allowing residents to hunt waterfowl and other small game on their own land without a hunting license throughout open season); N.D.C.C. § 20.1–03–07 (requiring non-residents to obtain a small game license).

7. Minnesota also asserts these statutory provision violated the Commerce Clause. The Court will address Minnesota's allegations regarding the Commerce Clause below.

state university); *Baldwin v. Fish and Game Commission of Montana*, 436 U.S. 371, 383, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978) (stating the Privileges and Immunities Clause has been used to prevent states from imposing unreasonable burdens on citizens of other states in their pursuit of employment, in the ownership and disposition of privately held property within the state, and in access to the courts, but that states may distinguish between residents and non-residents in the areas of voting and qualification for elective office).

In *Baldwin v. Fish and Game Commission of Montana*, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978), the United States Supreme Court was presented with the issue of whether states could distinguish between resident and non-residents in controlling "access to recreational big-game hunting" without running afoul of the Privileges and Immunities Clause, Art. IV, § 2. As the Supreme Court stated:

> Some distinctions between residents and non-residents merely reflect the fact that this is a Nation composed of individual States, and are permitted; other distinctions are prohibited because they hinder the formation, the purpose, or the development of a single Union of those States. Only with respect to those "privileges" and "immunities" bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and non-resident equally.

*Id.* at 383, 98 S.Ct. 1852. The Supreme Court reasoned that the hunting of big game is not an activity protected by the Privileges and Immunities Clause.

Elk hunting by non-residents in Montana is a recreation and a sport. In itself—wholly apart from license fees—it is costly and obviously available only to the wealthy non-resident or to the one so taken with the sport that he sacrifices other values in order to indulge in it and to enjoy what it offers. It is not a means to the non-resident's livelihood. The mastery of the animal and the trophy are the ends that are sought; appellants are not totally excluded from these....

> Appellants' interest in sharing this limited resource on more equal terms with Montana residents simply does not fall within the purview of the Privileges and Immunities Clause. Equality in access to Montana elk is not basic to the maintenance or well-being of the Union. Appellants do not—and cannot—contend that they are deprived of a means of a livelihood by the system or of access to any part of the State to which they may seek to travel. We do not decide the full range of activities that are sufficiently basic to the livelihood of the Nation that the States may not interfere with a non-resident's participation therein without similarly interfering with a resident's participation. Whatever rights or activities may be "fundamental" under the Privileges and Immunities Clause, we are persuaded, and hold, that elk hunting by non-residents in Montana is not one of them.

*Id.* at 388, 98 S.Ct. 1852. A significant number of states, in addition to North Dakota, differentiate between residents and non-residents in their respective hunting and fishing regulations:[8] Further, vir-

---

8. *See* Alaska Stat. § 16.05.255(d) (Michie 2004) (preference for residents in the taking of moose, deer, elk and caribou); Ariz. Admin. Code § R12–4–114 (2004) (ten percent limit on number of non-resident bighorn sheep, buffalo, bull elk & antlered deer permits north of the Colorado River); Ariz. Ad-

min. Code § R12–4–422 (2004) (the Commission may limit the number of sport falconry licenses if there is a reason to believe that a species of raptors may be over-harvested by non-residents); Cal. Fish & Game Code §§ 331(a), 332(b) (2005) (issuance of license for pronghorn and elk limited to residents);

tually all states have license fee differen- tials that prefer residents.

Colo.Code Regs. §§ 218A, 219A, 227A, 270D (2005) (ten percent of permits for Rocky Mountain bighorn sheep, desert bighorn sheep, mountain goat and moose available for non-residents); Fla. Admin. Code Ann. 68A § 5.005 (2005) (ten percent of special-opportunity hunting permits available for non-residents); Idaho Code § 36–408(2) (2004) (Fish and Game Commission authorized to limit or prohibit entirely non-residents in limited permit hunts and by Commission rule [IDAPA 13.01.08.260] the limit is set at ten percent); Ill. Admin. Code tit. 17, § 670.20 (2005) (limits the number of non-resident combination archery deer permits to 15,000 based upon a variety of factors); Iowa Code Ann. §§ 483A.7, 483A.8 (West 2003) (limits the number of non-resident turkey and deer permits); Kan. Stat. Ann. § 32–937($l$) (2004) (up to twenty percent limit on number of non-resident deer permits by rule, and may be restricted by species); Me.Rev.Stat. Ann. tit. 12, §§ 11152(3), 11154(2), 11155(2) (West 2004) (limits the number of non-resident licenses for antlerless deer, moose and turkey); Md.Code. Ann. Nat. Res. § 4–210.1 (2005) (twenty percent limit on the number of non-resident freshwater fishing guide licenses); Md.Code Ann. Nat. Res. § 4–618 (2005) (non-residents may not fish in nontidal waters of the state with nets); Md.Code Ann. Nat. Res. I §§ 10–604(f), 10–605(d), & 606(e) (2005) (subject to certain exceptions, non-residents may not hunt waterfowl while standing in water on the natural bottom or hunt waterfowl from a boat unless accompanied by a resident); Minn.Stat. § 97A.415(3) (1997) (non-residents may not obtain a license for an activity unless expressly authorized for non-residents); Minn.Stat. § 97A.475 subds. 1–3 (2004) (moose, elk and prairie chicken licenses issued to residents only); Minn.Stat. § 97B.301(6) (1997) (either sex deer permits issued to residents under 18); Minn.Stat. § 97B.301(7) (1997) (a resident may obtain an all season deer license); Mont.Code Ann. § 87–2–506(2) (2004) (limits to ten percent the number of big game permits when applications exceed the number to be issued); Neb.Rev.Stat. § 37–447(5) (2005) (deer hunting permits issued to non-residents after preference given for the issuance of resident permits); Neb.Rev.Stat. §§ 37.450, 37.451 (2004) (permits for elk and mountain sheep limited to residents); Neb. Rev. Stat § 37–457(3) (2005) (wild turkey permits issued to non-residents after preference given for the issuance of resident permits); Nev.Rev.Stat. § 501.181(3)(e) (2004) (Wildlife Commission authorized to control non-resident hunting); Nev.Rev.Stat. § 502.147 (2003) (restricted non-resident deer tags not to exceed sixteen percent of previous year tags or 400 tags, whichever is greater); Nev.Rev.Stat. § 502.250 (2004) (fee differential); Nev.Rev. Stat. § 503.245 (1997) (upland game bird hunting by non-resident may be forbidden or limited by the Commission); N.H.Code Admin. R. Ann. Fis 301.09(1)(2)(f) (2005) (limit on number of non-resident moose permits); N.M. Stat. Ann. § 17–3–16 (2005) (limit to twenty-two percent, twelve for guided and ten for unguided, the number of non-residents in limited permit hunts on public lands); N.Y. Enviro. Conser. Laws § 11–0913 (2004) (preference given to residents for additional deer management permits); Or.Rev.Stat. § 497.112(7), (8), (9) (2003) (limits number of non-resident tags in controlled hunts for mountain goat, mountain sheep, black bear, cougar, antelope, elk and deer); S.D. Cod. Laws § 41–6–18.1 (2003) (limits to 4000 the number of ten-day special non-resident waterfowl license per year); S.D. Cod. Laws § 41–6–18.4 (2003) (except in specified counties, the fall three-day temporary non-resident waterfowl licenses is valid only on private property, but not private property leased by the department for public hunting); S.D. Cod. Laws § 41–6–19.3 (1999) (landowner preference for deer or antelope license limited to resident landowners); S.D. Admin. R. § 41:06:01:09 (2005) (Game Dept. regulation limits to eight percent the number of permits for antelope, spring turkey, and in certain deer hunts); 2004 Utah Big Game Proclamation, 39–49 (limits to approximately eleven percent the number of non-resident permits in big game limited permit hunts); 2005 Utah Big Game Proclamation, 35–49 (limits the number of non-resident permits in big game limited permit hunts); Vt. Stat. Ann. tit. 10 § 4081(g)(2) (2004) (ten percent limit on non-resident antlerless deer permits); W. Va.Code § 20–2–46d (2004) (licenses to hunt wild boar limited to residents); Wis. Stat. §§ 29.164(3), 29.177(5) (2004) (resident preference categories when deer and turkey applications exceed available licenses); Wyo. Stat. Ann. § 23–2–401 (2000) (requires non-resident big game hunter to employ guides when hunting in federal wilderness area); Wyo. Admin. Ch. 6 § 5 (2005) (limits non-resident general deer licenses to specified quotas for certain regions; Wyo. Admin. Ch. 44 § 5 (2005) (big game licenses-certain percentage for each species of the total available limited quota initially offered to residents).

■ There is no question that the Supreme Court's pronouncement in *Baldwin* is controlling. Minnesota appears to recognize the vitality of *Baldwin*, in that it fails to engage in a serious discussion of the Privileges and Immunities Clause in its briefs. The Court finds that the reasoning of the United States Supreme Court as set forth in *Baldwin* is equally applicable to the current dispute. Access to recreational hunting by non-residents is simply not protected by the Privileges and Immunities Clause. As a result, the Court finds that Minnesota's claims based on the Privileges and Immunities Clause fail as a matter of law.

## B. *COMMERCE CLAUSE*

Minnesota's remaining claims allege that North Dakota has violated the Commerce Clause through its non-resident hunting regulations. Minnesota asserts that the hunting of waterfowl is commerce and subject to the dictates of the Commerce Clause. North Dakota contends that the pursuit of recreational hunting opportunities is not commerce and that North Dakota's non-resident hunting regulations do not impact commerce.

■ The Commerce Clause grants to Congress the power "[t]o regulate Commerce ... among the several States." U.S. Const. Art. I, § 8. The Commerce Clause has long been understood to have a "negative or dormant implication." *Southern Union Co. v. Missouri Public Service Comm'n*, 289 F.3d 503, 507 (8th Cir.2002). "The dormant Commerce Clause prohibits states from 'enact[ing] laws that discriminate against or unduly burden interstate commerce.'" *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir.2003). The purpose of the dormant Commerce Clause is to prevent states and their political subdivisions from promulgating protectionist policies. *See Houlton Citizens' Co-*

*alition v. Town of Houlton*, 175 F.3d 178, 185 (1st Cir.1999). When a state law is challenged on dormant Commerce Clause grounds, the court must first determine whether the law discriminates against interstate commerce.

■ As the United States Supreme Court has held several times, "in all but the narrowest · circumstances, state laws violate the Commerce Clause if they mandate 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the later.'" *Granholm v. Heald*, —— U.S. ——, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005) (quoting *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Or.*, 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)). The Commerce Clause " 'reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that has plagued relations among the Colonies and later among the States under the Articles of Confederation.'" *Id.* (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325–26, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)).

■ The Supreme Court has identified three broad categories of activity that Congress may regulate pursuant to the Commerce Clause: (1) the channels of interstate commerce, (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce, and (3) activities that substantially affect interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). "The definition of 'commerce' is the same when relied on to strike down or restrict state legislation as when relied on to support some exertion of federal control or regulation." *Camps Newfound/Owatonna, Inc. v. Town of Har-*

*rison,* 520 U.S. 564, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (citing *Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)). Thus, the "dormant" or "negative" Commerce Clause prevents states from establishing legislation that falls into one or more of the three categories enumerated in *Lopez.*

■ The category of activity known as "channels of interstate commerce" includes the regulation of highways railroads, air routes, navigable rivers, and telecommunications networks. This category also reaches "misuse" of channels of interstate commerce such as the interstate transport or shipment of stolen goods, kidnapped persons, prostitutes, and illegal lottery tickets. *See United States v. Ho,* 311 F.3d 589 (5th Cir.2002).

■ The second category includes instrumentalities of interstate commerce or persons or things in interstate commerce. It is clear that North Dakota's regulation of access to waterfowl in one of its game management zones is neither the regulation of a channel of interstate commerce or an instrumentality thereof.

If the dormant Commerce Clause applies to the regulated activity in this case it is primarily because of the third category identified in *Lopez,* namely, that the regulated activity "substantially affects interstate commerce." As stated by the United States Supreme Court, "The affecting commerce test was developed in our jurisprudence to define the extent of Congress' power over purely intrastate commercial activities that nonetheless have substantial interstate effects." *United States v. Robertson,* 514 U.S. 669, 670, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995).

■ State regulation of intrastate commercial activity can satisfy the substantial effect test in either of two ways: (1) if intrastate commercial activity by itself substantially affects interstate commerce or (2) if intrastate commercial activity by itself is too trivial to have a substantial effect on interstate commerce, substantially affects interstate commerce when aggregated with similar and related activities. *United States v. Ho.,* 311 F.3d 589, 598 (5th Cir.2002). In other words, the activity in question must be "some sort of economic endeavor." *United States v. Morrison,* 529 U.S. 598, 611, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). As the Eighth Circuit has held, the relevant question is "whether the regulated activity is commercial in the sense of being closely connected to some national commercial market." *Klingler v. Director, Dep't of Revenue,* 366 F.3d 614, 618 (8th Cir.2004).

## 1) *PERSONS IN COMMERCE*

■ Minnesota contends that North Dakota has impermissibly regulated "persons in commerce" through its non-resident waterfowl hunting regulations. Minnesota notes that North Dakota's non-resident hunting rules and regulations are an attempt to regulate non-resident hunters—not waterfowl. In Minnesota's view, non-residents who travel to North Dakota to hunt, or engage in any other form of wildlife-related recreation, are clearly "persons in commerce." Minnesota likens non-resident hunters to staff and patients at abortion clinics, African–Americans discriminated against in public accommodations, and campers at a non-profit summer camp in Maine, in an attempt to show non-resident hunters are persons in commerce. *See United States v. Dinwiddie,* 76 F.3d 913 (8th Cir.1996); *United States v. Hart,* 212 F.3d 1067 (8th Cir.2000); *United States v. Weslin,* 156 F.3d 292 (2d Cir. 1998); *Brown v. Anderson,* 202 F.Supp. 96 (D.Alaska 1962); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *Camps Newfound/Owatonna, Inc. v. Town of Har-*

*rison,* 520 U.S. 564, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997). In response, North Dakota contends that non-resident hunters are not "persons in commerce."

Since the United States Supreme Court's decision in *Lopez,* few cases have discussed the second prong or the "persons in commerce" category. Those cases discussing "persons in commerce" have defined them as "passengers, travelers, operators, or crew members on the instrumentalities of interstate commerce," *United States v. Shahani–Jahromi,* 286 F. Supp 2d 723, 733 (E.D.Va.2003), or as "persons ... with a plain and clear nexus to interstate commerce" *Groome Resources Ltd., L.L.C. v. Parish of Jefferson,* 234 F.3d 192, 203 (5th Cir.2000) (citing *United States v. Bird,* 124 F.3d 667, 674 (5th Cir.1997)).

The Court is not convinced that non-resident hunters have a "plain and clear nexus to interstate commerce." Unlike the individuals in the cases cited by Minnesota, the purpose for the non-resident hunters' interstate movement is the pursuit of a purely recreational activity— hunting. The individuals involved in the cases relied upon by Minnesota traveled between states to engage in economic activity—purchasing medical services, public accommodations, and camp programming. There is a clear difference between the purchase of products and services—activities inherently economic in nature—and the engagement in purely recreational, sporting activity.[9] The Court expressly finds that non-resident hunters are not "persons in commerce," and thus do not fall within the purview of the Commerce Clause. Minnesota's assertion that non-resident hunters are persons in commerce fails as a matter of law.

### 2) *ACTIVITY SUBSTANTIALLY AFFECTING INTERSTATE COMMERCE*

 Minnesota also argues that North Dakota's non-resident hunting regulations substantially affect interstate commerce in violation of the Commerce Clause. North Dakota contends that access to waterfowl by non-residents is not interstate commerce and the regulation of non-resident hunters does not substantially affect interstate commerce.[10]

"*Lopez's* review of Commerce Clause case law demonstrates that in those cases where [the United States Supreme Court] ha[s] sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor." *United States v. Morrison,* 529 U.S. 598, 611, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). The activities of a for-profit or non-profit entity providing a service or product or the purchasing of a service or product is unquestionably commerce, and in certain instances the regulation of these activities could substantially affect interstate commerce. *Camps Newfound/Owatonna, Inc. v. Town of Harrison,* 520 U.S. 564, 573, 575, 117 S.Ct. 1590, 137 L.Ed.2d 852

---

**9.** In reaching this conclusion, the Court notes that the regulations in question do not apply to any type of commercial hunting or fishing. The Court recognizes that several states have robust commercial fishing economies that serve as the livelihood for many of their citizens and which may implicate the Commerce Clause. *See Hughes v. Oklahoma,* 441 U.S. 322, 324, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979); *Toomer v. Witsell,* 334 U.S. 385, 403, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). However, such case law does not apply to purely recreational hunting or fishing.

**10.** North Dakota engages in a lengthy discussion of the case law holding that wildlife is not an article of interstate commerce. Minnesota has not contended that North Dakota's hunting regulations attempt to regulate articles of commerce. As a result, the Court finds it unnecessary to determine whether wildlife is an article of commerce.

(1997). However, just like the statutes at issue in *Lopez* and *Morrison*, North Dakota's non-resident hunting regulations have nothing to do with "commerce" or any sort of economic activity. *Lopez*, 514 U.S. 549, 561, 115 S.Ct. 1624, 131 L.Ed.2d 626. Recreational hunting is simply not a product[11] or a service.

Nevertheless, Minnesota asserts that because non-resident hunters spend financial resources to pursue their recreation, restricting access to non-resident hunters substantially affects interstate commerce. Minnesota asserts that the "costs of hunting" by non-residents includes resources spent on travel, equipment, guide services, meals and lodging. Minnesota also argues that North Dakota has impermissibly interfered with non-resident hunters' rights to travel. North Dakota argues that such attenuated arguments are exactly the type of arguments rejected by the Supreme Court in *Lopez* and *Morrison*.

In *Lopez*, the United States Supreme Court rejected the argument that the possession of firearms in a school zone substantially affected interstate commerce. The Supreme Court stated:

> We pause to consider the implications of the Government's arguments. The Government admits, under its "costs of crime" reasoning, that Congress could regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they related to interstate commerce. Similarly, under the Government's "national productivity" reasoning, Congress could

regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate.

*Lopez*, 514 U.S. 549, 564, 115 S.Ct. 1624, 131 L.Ed.2d 626. The Supreme Court concluded that "[t]he possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at 567, 115 S.Ct. 1624.

Similarly in *Morrison*, the United States Supreme Court rejected the notion that gender-motivated crimes of violence substantially affected interstate commerce. *United States v. Morrison*, 529 U.S. 598, 612, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). The Supreme Court opined:

> The reasoning that petitioners advance seeks to follow the but-for causal chain from the initial occurrence of violent crime (the suppression of which has always been the prime object of the States' police power) to every attenuated effect upon interstate commerce. If ac-

---

**11.** The sale or offer for sale, of "a migratory bird protected by the Migratory Bird Treaty Act (16 U.S.C. § § 703–712)" is prohibited by 50 C.F.R. § 12.37. Additionally, 50 C.F.R. § 20.91 limits the commercial use of feathers to "the making of fishing flies, bed pillows, and mattresses, and for similar commercial uses." Commercial use does not include the use of the feather of migratory birds for "purchase, [sale], or barter" "for millinery or or-

namental use." It also precludes the sale or barter of "mounted specimens of migratory game birds." *Id.* North Dakota law also provides that a legally taken game bird may be sold "for decorative purposes or in the making of art works for private use or sale, except that any party of any legally taken migratory bird may not be sold or bartered except as provided under federal regulation." N.D.C.C. § 20.1–04–02.1.

cepted, petitioners' reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption. Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence since gender-motivated violence, as a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part.

529 U.S. 598, 615, 120 S.Ct. 1740. The Court ultimately concluded that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." *Id.* at 613, 120 S.Ct. 1740.

Minnesota's argument that limiting access to non-resident waterfowl hunters substantially affects interstate commerce are unpersuasive. Much like the assertions in *Lopez* and *Morrison*, Minnesota's argument that access to waterfowl hunting substantially affects interstate commerce are too attenuated. The hunting laws at issue in this dispute do not regulate or impede the purchase of firearms, ammunition, apparel, lodging or guide services. North Dakota has merely limited non-resident hunters' access to waterfowl within the state. The fact that a law may discourage travel-but does not itself regulate travel-is not violative of the Commerce Clause. *Lopez,* 514 U.S. 549, 564–67, 115 S.Ct. 1624, 131 L.Ed.2d 626; *Morrison,* 529 U.S. 598, 615, 120 S.Ct. 1740. North Dakota's waterfowl regulations do not interfere with the plaintiffs' right of ingress to and egress from North Dakota for hunting purposes. The hunting regulations neither regulate nor impede travel. Non-residents remain free to travel to and from North Dakota and engage in the recreational sport of hunting. The regulation of access to the sport of hunting does not bring the travel of hopeful hunters within the scope of the Commerce Clause. The

Court finds that any impact North Dakota's non-resident hunting regulations have on commerce is incidental at best.

If the Court were to accept Minnesota's arguments that recreational hunting substantially affects economic activity, it would essentially divest states of their ability to regulate recreational activities taking place within in its borders simply because money is spent in the pursuit of such activities. This is a contorted reading of both the Commerce Clause and the United States Supreme Court precedent interpreting the Commerce Clause.

In its attempt to blur the lines between recreational activity and economic activity, Minnesota ignores the prevailing case law affirming a state's ability to regulate wild game within its borders. As the Supreme Court noted in *Baldwin*, state regulation of wild game has a long and storied history. "Protection of the wild life of the State is peculiarly within the police power, and the State has great latitude in determining what means are appropriate for its protection." *Baldwin v. Fish and Game Commission of Montana,* 436 U.S. 371, 391, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978).

It is apparent that Minnesota has modeled its lawsuit after the Ninth Circuit case of *Conservation Force, Inc. v. Manning,* 301 F.3d 985, 988 (9th Cir.2002) *cert. denied,* 537 U.S. 1112, 123 S.Ct. 902, 154 L.Ed.2d 786 (2003). In *Conservation Force,* the Ninth Circuit reversed a district court decision and held that Arizona's 10% cap on non-resident hunting of bull elk and antlered deer violated the Commerce Clause. After *Conservation Force,* similar statutes in Wyoming were challenged. *Schutz v. Wyoming,* No. 02–CV–154–D (D.Wyo. May 28, 2003). The Court finds persuasive the following passages from *Schutz.*

Quite simply the [*Conservation Force, Inc. v. Manning* ] court's and the Plain-

tiff's reliance on [*Camps Newfound/Owatonna, Inc. v. Town of Harrison* ] is misplaced. Wyoming, like Arizona, is not regulating a significant economic activity. Rather, they are merely controlling how and when big game animals can be hunted. Bringing these statutes under the umbrella of Commerce Clause jurisdiction would run counter to the long standing precedent of viewing these cases under the article of commerce analysis. Moreover, extending the "substantial effect" analysis ignores the Court's recent curtailment of the Commerce Clause in *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) and *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). Therefore, this Court finds that the decision in *Manning* and Plaintiff's argument to apply the "substantial effect" analysis to big game quota statutes is inconsistent with United States Supreme Court precedent. Accordingly, the dormant Commerce Clause is not applicable to Wyoming's big game statutes.

*Id.* at 17–18. The *Schutz* case has been appealed and the parties are awaiting a decision from the Tenth Circuit Court of Appeals. This Court wholly rejects the Ninth Circuit's analysis in *Conservation Force.* The decision is flawed in its reasoning and unprecedented.

The Court's finding that recreational hunting is not commerce, the Court's finding that recreational hunting does not substantially impact interstate commerce, and the well-established interest of a state's ability to regulate wildlife within its border, sound the death knell for Minnesota's claims. The Court expressly finds that North Dakota's regulation of non-resident hunting neither implicates nor violates the Commerce Clause. As a result, Minnesota's remaining claims fail as a matter of law. The individual plaintiff's attendant 42 U.S.C. § 1983 claims also fail as a matter

of law because no constitutional violation exists.

It is clear and undisputed that most states differentiate between residents and non-residents in their hunting laws. For example, Montana law limits non-resident hunters to no more than ten percent of the big game licenses where resident applications exceed the number of available licenses. Mont.Code Ann. § 87–2–506(2) (2004); Mont. Admin. R. 12.3.105(1) (2004). Iowa does not allow non-residents to hunt turkeys during the fall turkey season. Iowa Admin. Code R. 571–99.1 (2004). Iowa limits non-residents to only 2,300 licenses during the spring turkey season. Iowa Code § 482A.7(3) (2004). Iowa also imposes strict quotas for non-resident deer licenses in each of its ten non-resident zones. Iowa Code § 483A.8(3) (2004); Iowa Admin. Code R. 571–94.6 (2004). South Dakota prohibits any non-resident hunting in the popular Custer State Park. *See* S.D. Admin. R. 41:06:16:11, 41:06:16:11.01 (2004). South Dakota either limits non-resident licenses for deer, turkey, antelope, elk, bighorn sheep, and mountain goat, or excludes non-residents altogether. *See e.g.,* S.D. Admin. R. 51:06:20, 41:06:20:04 (2004) (West River Prairie deer); S.D. Admin. R. 41:06:21:04 (2004) (East River Prairie deer); S.D. Admin. R. 41:06:24:04(1) (2004) archery antelope; S.D. Admin. R. 41:05:26:04(1) (2004) (Black Hills elk); S.D. Admin. R. 41:06:29:04 (2004) (mountain goat); S.D. Admin. R. 41:05:56:04 (2004) (Black Hills bighorn sheep). Thus, legislative assemblies have broad discretion to differentiate between residents and non-residents in their hunting and fishing laws.

Recreational hunting is not a fundamental right and states have a legitimate interest in regulating the taking of wildlife and fish within its boundaries. This necessarily includes laws or regulations that differ-

entiate between residents and non-residents with respect to the availability of licenses or permits, the kind and number of fish or game that may be taken, or the fees charged in connection with the issuance of licenses or permits for hunting or fishing.

While North Dakota has not violated the Constitution by enacting new non-resident waterfowl hunting regulations, the wisdom of such a decision is questionable. Hopefully, the Legislative Assembly of North Dakota will carefully reconsider the decisions made in 2003 concerning the new hunting regulations and the ramifications to North Dakota in terms of the impact on tourism and economic development. To an objective outsider, the legislative and administrative changes made to North Dakota's hunting regulations in 2003 seem ill-advised at best. North Dakota's decision to differentiate between resident and non-resident waterfowl hunters may likely spur other states to do the same. As Minnesota has made clear in this litigation, its legislature is considering taking steps to restrict the fishing access of non-residents from states that limit access to fish and game based on residency. In retaliation, Minnesota is considering legislative changes which would ban non-residents from fishing during the first two weeks of opening fishing season. North Dakota residents should not be surprised to see their access to recreational hunting and fishing opportunities diminish in other states, particularly in Minnesota. Hopefully, a more sane, objective, and reasonable approach will be undertaken by government officials from both states to end the litany of bickering.

### C. *RECENT CONGRESSIONAL LEGISLATION*

On May 12, 2005, North Dakota filed a Motion to Dismiss asserting that the recent passage of the "Reaffirmation of State Regulating of Resident and Non-resident Hunting and Fishing Act of 2005," Pub.L. No. 109–13, § 6036, 119 Stat. 231 (2005), resolves the Commerce Clause issues in this dispute. Congress enacted legislation renouncing any federal interest under the Commerce Clause in regulating hunting and fishing. Minnesota's time to respond to the recently-filed motion has not yet expired.

The Court finds it unnecessary to address the merits of North Dakota's Motion to Dismiss other than to note that Congressional interpretation of what is and is not interstate commerce is not controlling on the judicial branch. *Cf. United States v. Lopez*, 514 U.S. 549, 557 n. 2, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) ("Whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled only by [the United States Supreme Court]."). Thus, North Dakota's Motion to Dismiss is denied as moot.

### III. *CONCLUSION*

The Court **DENIES** the Plaintiffs' Motion for Summary Judgment. (Docket No. 24). The Court **GRANTS** the Defendants' Motion for Summary Judgment. (Docket No. 35). The Court **DENIES** the Defendants' Motion to Dismiss as moot. (Docket No. 46). Let judgment be entered accordingly.

**IT IS SO ORDERED.**