**F I L E D**

PUBLISH

**July 11, 2005**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DONALD J. SCHUTZ,

      Plaintiff-Appellant,

  v.

No. 03-8051

TOM THORNE, Wyoming Game &
Fish Director, in his official capacity;
STATE OF WYOMING; J. MICHAEL
POWERS, Wyoming Game & Fish
Commissioner, for District #1, in his
official capacity; LINDA FLEMING,
Wyoming Game & Fish
Commissioner, for District #2, in her
official capacity; DOYLE DORNER,
Wyoming Game & Fish commissioner,
for District #3, in his official capacity
as commission vice president; JERRY
SANDERS, Wyoming Game & Fish
Commissioner, for District #4, in his
official capacity; GARY LUNDVALL,
Wyoming Game & Fish
Commissioner, for District #5, in his
official capacity as commission
president; KERRY POWERS,
Wyoming Game & Fish
Commissioner, for District #6, in his
official capacity; M. HALE
KREYCIK, Wyoming Game & Fish
Commissioner, for District #7, in his
official capacity,

      Defendants-Appellees.

_____

U.S. OUTFITTERS, INC., JEAN
TAULMAN, LAWRENCE
MONTOYA, FILIBERTO VALERIO,
INTERNATIONAL ASSOCIATION
OF FISH AND WILDLIFE
AGENCIES,

     Amici Curiae.

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WYOMING
(D.C. NO. 02-CV-165-D)**

_____

Donald J. Schutz, Saint Petersburg, Florida, for Plaintiff-Appellant.

Jay A. Jerde, Senior Assistant Attorney General (with Patrick J. Crank, Attorney General, and Jennifer A. Golden, Deputy Attorney General, on the brief), Office of the Wyoming Attorney General, Cheyenne, Wyoming, for Defendants-Appellees.

James R. Scarantino, Albuquerque, New Mexico for Amici Curiae U.S. Outfitters, Inc., Jean Taulman, Lawrence Montoya, and Filiberto Valerio.

Paul A. Lenzini filed an amicus brief for International Association of Fish and Wildlife Agencies.

_____

Before **TYMKOVICH** , **McWILLIAMS** , and **PORFILIO** , Circuit Judges.

_____

**TYMKOVICH** , Circuit Judge.

_____

The question in this case is whether three Wyoming statutes unconstitutionally limit equal access to hunting opportunities for nonresidents. Donald Schutz, a Florida resident, brings this 42 U.S.C. § 1983 suit against the state of Wyoming and various state officials representing the game and fish commission (together "Wyoming") for allegedly violating his constitutional rights. Relying on the Equal Protection Clause of the Fourteenth Amendment and the so-called "dormant" Commerce Clause of Article I, Section 8, of the United States Constitution, he claims that sections 23-2-101 (the "Fee Statute"), 23-1-703 (the "Quota Statute"), and 23-2-401 (the "Guide Statute") of the Wyoming code impermissibly burden nonresident hunters.

The district court granted summary judgment in favor of the Defendants, and Schutz filed a timely appeal. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's holdings regarding Schutz's standing to challenge the statutes. As to the merits, (a) we affirm the district court's dismissal of the statutory challenges on equal protection grounds, and (b) regarding the dormant Commerce Clause claim, we find that it is moot in light of Section 6063 of House Bill 1268, approved by the United States Congress and signed into law on May 10, 2005.

## I. Background

### A. Factual and Procedural History

Schutz resided in Wyoming from 1954 until his graduation from the University of Wyoming in 1975. During that time, Schutz traveled the state extensively, hunting species of big game. After moving out-of-state, he often returned during the various hunting seasons. Schutz is not alone in finding Wyoming an enticing place to hunt big game. According to amicus U.S. Outfitters, Inc., nonresident hunters in 2001 spent approximately $123 million in Wyoming. Schutz himself claims that Wyoming receives $38.9 million in direct revenue from hunters and fishermen, three-quarters of which comes from nonresidents. App. tab 5 at 10.

Wyoming has responded to the interest in these sports by crafting a variety of regulatory provisions. Three such statutory provisions led Schutz to file the present claim. As discussed in detail below, the first is a Fee Statute, which charges higher fees to out-of-state hunters compared to in-state hunters. The second is a Quota Statute, which reserves a greater number of licenses for residents. Finally, Wyoming adopted a Guide Statute, requiring out-of-state hunters to employ either a professional or resident guide to hunt in designated wilderness areas.

In 2002, Schutz purchased a nonresident elk license, and used it to hunt on non-wilderness lands. Some months later, Schutz applied for a 2003 license to hunt bighorn sheep but decided against applying for elk or deer licenses because

the licenses were too expensive, and he was unwilling to hire a professional guide or find a resident guide. The record does not disclose whether he in fact drew a bighorn sheep license.

Schutz then filed suit challenging the constitutionality of these three provisions of the Wyoming code. Wyoming responded by moving to dismiss, and again moved to dismiss after Schutz filed an amended complaint. The district court converted Wyoming's motion to a motion for summary judgment and allowed both parties to supplement the record. Schutz also filed a cross motion for summary judgment. Finding that Schutz did not have standing to challenge the Guide Statute and that the Quota and Fee Statutes did not violate his constitutional rights, the court granted summary judgment for Wyoming.

## B. Wyoming's Hunting Statutes

Schutz claims that three hunting statutes, individually and in concert, unconstitutionally limit his ability to legally hunt big game in the state of Wyoming. The statutes create special preferences for Wyoming residents in three ways: (1) in-state hunting licenses are cheaper, (2) more licenses are allocated to residents, and (3) residents are exempt from a requirement that hunters in wilderness areas obtain a guide.

*1.    The Fee Statute*

The Fee Statute assesses much higher hunting license fees on out-of-state residents:

(xiii) Resident deer license; one deer . . . . . . . . . . . . . . . . . . . . . $25.00
(xiv) Nonresident deer license; one deer . . . . . . . . . . . . . . . . .$210.00
. . .
(xvii) Resident elk license; one elk . . . . . . . . . . . . . . . . . . . . . .$35.00
(xviii) Nonresident elk license; one elk . . . . . . . . . . . . . . . . . .$400.00
. . .
(xxi) Resident bighorn sheep license; one bighorn sheep . . . . . . .$75.00
(xxii) Nonresident bighorn sheep license; one bighorn sheep . .$1500.00

Wyo. Stat. Ann. § 23-2-101 (2002).

The fee difference is applicable to every species of big and trophy game, including, among others, deer, elk, mountain lion, grizzly bear, and antelope. The fee structure also includes a reduced rate for resident and nonresident youth.

2. *The Quota Statute*

The Quota Statute reserves to Wyoming residents a majority of the available licenses for exotic game such as bighorn sheep, mountain goats, moose, and grizzly bear:

The commission shall reserve eighty percent (80%) of the moose and seventy-five percent (75%) of the bighorn sheep, mountain goat and grizzly bear licenses to be issued in any one (1) year for resident hunters.

Wyo. Stat. Ann. § 23-1-703(e) (2002).

A smaller percentage of deer and elk licenses are reserved to Wyoming residents.

3. *The Guide Statute*

The Guide Statute creates two classes of hunters—resident and nonresident—for wilderness hunting:

> (a) No nonresident shall hunt big or trophy game animals on any designated wilderness area, as defined by federal or state law, in this state unless accompanied by a licensed professional guide or resident guide. . . .
>
> (b) Any resident possessing a valid resident big or trophy game animal license may apply for and receive a resident guide license. . . .

Wyo. Stat. Ann. § 23-2-401 (2002).

## II. Analysis

### A. Standard of Review

We review *de novo* questions of subject matter jurisdiction, including whether a plaintiff has standing to sue. *Wilson v. Glenwood Intermountain Props.*, 98 F.3d 590, 593 (10th Cir. 1996). We also review *de novo* the grant of a motion for summary judgment. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury

-7-

could return a verdict for the nonmoving party." *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). The nonmoving party must nonetheless present "facts such that a reasonable jury could find in [his] favor." *Id.*

## B. Standing

Standing analysis, as the district court recognized, is as important as it is fact-sensitive. The doctrine is especially significant when federal courts sit in judgment over duly enacted state laws, given our concern about "the proper—and properly limited—role of the courts in a democratic society." *Allen v. Wright*, 468 U.S. 737, 750 (1984); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 124 S. Ct. 2301, 2308 (2004). Whether a plaintiff has standing to sue "turn[s] on the precise allegations of the parties seeking relief" and must be supported by specific facts. *Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877, 882 (10th Cir. 1992) (quoting *National Wildlife Fed'n v. Hodel*, 839 F.2d 694, 703–04 (D.C. Cir. 1988)). As a result, standing analysis is often as confusing as it is fundamental. *See Schaffer v. Clinton*, 240 F.3d 878, 882 n.5 (10th Cir. 2001) (citing *Valley Forge Christian College v. Americans United for Separation of Church and State,*

*Inc.*, 454 U.S. 464, 475 (1982)); 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3531 (2d ed. 1984)).

The three constitutional elements of standing are nonetheless well established:

> First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Nova Health Sys. v. Gandy*, 388 F.3d 744, 749–51 (10th Cir. 2004). These three elements—injury, causation, and redressibility—must exist before federal courts will exercise jurisdiction. We turn first to whether Schutz meets these requirements as to each statute.

*1. The Fee Statute*

We agree with the district court that Schutz has standing to challenge the Fee Statute. First, the higher fee he paid as a nonresident for an elk license in 2002 and a big horn sheep license in 2003 is an actual, concrete injury that the courts could remedy. *See Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772–73 (2000). Second, the increased cost for nonresidents over residents is an injury caused by the statute. Finally, a change to the statute, eliminating the gap between resident and nonresident fees, would

-9-

redress this grievance. Thus, Schutz's Fee Statute challenge meets the three basic constitutional standing requirements.

2.     *The Quota Statute*

Second, we also agree with the district court that Schutz has standing to challenge the Quota Statute. The district court based this decision on the "equal-footing" doctrine set forth in *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666–67 (1993). In that case, the Court held that the inability of eligible bidders to compete for a governmental benefit—contract set asides for racial minorities—is an injury in fact, even when the petitioning party cannot demonstrate that they "would have obtained the benefit but for the barrier." *Id*. at 666. "The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.; see also Gratz v. Bollinger*, 539 U.S. 244, 261–62 (2003) (describing cases where standing found even though plaintiff not denied a benefit). We have applied the equal footing analysis in this circuit. *See Cache Valley Elec. Co. v. Utah Dep't of Transportation*, 149 F.3d 1119, 1122 (10th Cir. 1998).

Here, the quota system requires that Schutz and other out-of-state applicants compete for a limited number of hunting licenses, while a separate pool of resident applicants compete for a larger portion of the available licenses.

Schutz can demonstrate standing if he can show that he applied for a hunting license and that Wyoming law made the "benefit" more difficult to obtain because of its preference system. *Id.* at 1122; *see also Conservation Force, Inc. v. Manning*, 301 F.3d 985, 990 & n.3 (9th Cir. 2002) (finding standing to challenge similar regulations on this basis where plaintiffs had never received a license). This he has done. Schutz is required to compete unequally for a limited supply of bighorn sheep licenses that are disproportionately reserved for Wyoming residents. He is therefore injured in fact and his injury is caused by the Statute. A favorable ruling in this case would redress his injuries by leveling the playing field for license applicants. He therefore has satisfied our standing requirements for his challenge to the Quota Statute.

3. *The Guide Statute*

Schutz's standing as to the Guide Statute is less clear. The district court found that Schutz had neither "set forth in his affidavit sufficient facts detailing that he has suffered a concrete or particularized imminent injury," nor "demonstrated that court action will redress these alleged injuries." *Schutz v. Wyoming*, No. 02-CV-165-D, slip op. at 6–7 (D. Wyo. May 28, 2003) ("Order"). In particular, the Guide Statute would not, according to the district court, actually "force" Schutz to hire a guide to hunt bighorn sheep, since the statute left him

-11-

free to hunt without a guide in non-wilderness areas. [1] Wyo. Stat. Ann. § 23-2-401(a). Further, the court held that the Guide Statute allows any resident of Wyoming to serve as a resident guide merely by applying for a license, thus likely reducing the expense and difficulty of procuring a guide. Finally, the court was least persuaded by Schutz's claim that the statute interferes "with his right to *consider* selling a bighorn mount on E-bay." Order at 6. The court concluded that to make such a sale, Schutz would have to successfully attain four uncertain goals: draw a license, kill a trophy bighorn, remove the cape and horns of the animal without damage, and find a willing buyer. Until Schutz "has been denied the opportunity to hunt in a wilderness area or forced to pay for a guide, he has yet to suffer any injury," and thus does not have standing to challenge the Guide Statute. *Id.*

We agree, but for slightly different reasons. Schutz asks us to assert jurisdiction over a claim when he has yet to be injured by the challenged statute. First of all, he hunted for elk in 2002 and nothing in his affidavit suggests he was limited by operation of the Guide Statute in the 2002 hunt. He alleges he would

---

[1] Wyoming's hunting regulations divide the state into various "units," granting big game licenses to hunt in a particular unit. Schutz specifically sought a license to hunt in Unit Three, two-thirds of which is part of the Washakie Wilderness Area. Fully one-third of Unit Three, however, is not a designated wilderness area. Thus, as the district court pointed out, the Guide Statue does not apply to one-third of Unit Three. *See* Order at 5–6.

-12-

like to hunt in wilderness areas *in the future* without a guide, but at the time he filed for summary judgment he had not yet applied for 2003 deer or elk licenses and established that the Guide Statute in fact limited his hunting options. Standing is not conferred by "conjecture" or "speculation" about future hunts.

As to Schutz's application for a 2003 big horn sheep license, he also has not demonstrated standing. He may indeed be forced to choose between the unpalatable alternatives of hunting in non-wilderness areas, paying for a guide, or foregoing hunting in Wyoming. But he has not demonstrated in his affidavit that he actually drew a big horn sheep hunting license and was denied access to hunting in wilderness areas. [2] Until this choice is actually put to Schutz, no cognizable injury in fact exists.

We therefore affirm the district court's ruling that Schutz has not suffered an injury sufficiently concrete to give him standing to challenge the Guide Statute.

## C. Equal Protection

_____

[2] We note that the district court's order, Schutz's affidavit, and the briefs all state that Schutz applied for a 2003 bighorn sheep license, though the record fails to disclose whether he in fact successfully drew a license, and if so, whether he relinquished this right or acted on it. Had such a record been developed, our decision on this point might have been different. We also note that in his complaint and amended complaint, Schutz confessed that he did not so much intend to redress an actual injury as "to test the federal constitutionality of three Wyoming statutes." App. tab 2 at 2, tab 5 at 2.

We now turn to the merits of Schutz's claims. Schutz first argues that the district court erred in finding that the Fee and Quota Statutes did not violate the Fourteenth Amendment's Equal Protection Clause. The court below, of course, found that hunters are not a suspect class and that hunting is not a fundamental right, thus correctly concluding that the standard of review is the rational basis test. *See Baldwin v. Fish and Game Comm'n of Montana*, 436 U.S. 371, 389 (1978). Under that standard, "courts will uphold [a law] if it is rationally related to a legitimate end." *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 532 (10th Cir. 1998).

Applying rational basis review, the district court concluded that the Fee and Quota Statutes are reasonably related to a number of legitimate ends. First, they "help to encourage residents to maintain their residency and by extension support [Wyoming] conservation programs." Order at 10. Second, given that residents tend to hunt smaller female game while nonresidents tend to hunt larger "trophy" males, the Statutes help preserve the gender balance needed to maintain herd sizes. *Id.* Finally, the preferences for residents "provide[] an economic boost because many people in Wyoming hunt outside their county of residence." *Id.* at 11.

Schutz apparently concedes that these are legitimate ends and questions only whether the Statutes further them in a rational way. [3] According to Schutz, the district court erred in dismissing this claim at the summary judgment stage because, in his view, "the analysis of the reasonable relationship of the regulation to the means is a factual question, not a legal issue." Aplt. Op. Br. at 21. Schutz is mistaken. Under rational basis review, "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Communications*, 508 U.S. 307, 315 (1993); *Powers v. Harris*, 379 F.3d 1208, 1225 (10th Cir. 2004) (Tymkovich, J., concurring). Moreover, "those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.'" *Beach Communications*, 508 U.S. at 315 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364 (1973)). Under this standard, "statutory classifications will be set aside only if no grounds can be conceived to

---

[3] The one exception is Schutz's objection to the lottery-within-a-lottery system of the Fee Statute, Wyo. Stat. Ann. § 23-2-101(f), whereby nonresidents can buy their way into a more exclusive drawing for a set-aside portion of the nonresident licenses. This may suggest, as Schutz contends, that Wyoming is using the Fee Statute to increase the revenue it collects. More likely, the scheme increases the odds of nonresidents in drawing a license. In any event, for purposes of equal protection, it is not illegitimate to design a licensing scheme that provides financial incentives to increase one's odds in a license lottery. *See Powers v. Harris,* 379 F.3d 1208, 1219–23, 1226 (describing economic regulation and equal protection).

-15-

justify them." *Powers*, 379 F.3d at 1217 (quoting *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 809 (1969)). Nor should courts in reviewing challenged classifications "(1) second guess the 'wisdom, fairness, or logic' of legislative choices; (2) insist on 'razor-sharp' legislative classifications; or (3) inquire into legislative motivations." *Id.* at 1225 (citations omitted).

With these principles in mind, we turn to the application of the rational basis standard to the facts of this case. While we agree with Schutz that some of Wyoming's goals may seem speculative, we cannot conclude that there exists *no* reasonable justification for the in-state preferences. Many reasons exist, in fact, for states to adopt a preference scheme. Residential preferences are commonly considered a benefit of state citizenship for finite resources such as wildlife resources, higher education, or access to state run facilities. While the reasons for preferences are varied—and context specific—it is not irrational to provide them. In-state residents, for example—especially those who hunt or fish—have a vested long-term interest in the sustainability of Wyoming's wildlife management system. This includes not just political support for such programs, but direct financial support through fees and taxes. In-state residents may be counted on more reliably to hunt in Wyoming year after year, thus supporting long-term game and fish habitat preservation, herd management programs, new species programs such as the introduction of the gray wolf or grizzly bear populations, or, finally,

-16-

the more mundane aspects of wildlife programs such as adequate highways, off-road and hiking trails, fire protection, and search and rescue programs. While out-of-state hunters also contribute directly and indirectly to these programs through hunting and fishing license fees and sales taxes, their financial support does not replace that made by Wyoming residents. The in-state preference is a logical and reasonable way to reward this support and foster the long-term success of wildlife management programs.

The district court's other proffered reasons are equally plausible. The legislature could reasonably conclude that lower fees for the large population of resident hunters encourages them to apply for and hunt outside their home counties and thereby provide an "economic boost" to rural areas. While out-of-state residents also travel to Wyoming, the promotion of a reliable core of residential hunters could be seen as a rational method to encourage the year-to-year economic stability essential to small communities. Similarly, Wyoming could reasonably believe that resident hunters will more likely hunt smaller animals across a larger cross-section of the state, thereby promoting the State's interests in herd management. In-state hunters might also be more familiar with state gaming regulations and more willing to enforce them. In addition to these objectives, we note that the in-state preferences provide an advantage for the economically-disadvantaged hunters and young hunters (through lower license

fees). These reasons together support Wyoming's statutory classifications at issue here.

Finally, it is worth noting the Supreme Court has found residency regulations similar to those at issue here further a state's interest in recouping costs associated with wildlife and habitat preservation. *See Baldwin v. Fish and Game Comm'n of Montana*, 436 U.S. 371, 389–90 (1978). In *Baldwin*, a group of plaintiffs challenged Montana's elk-hunting license scheme, a scheme which created a differential license fee structure for out-of-state hunters. In analyzing whether the scheme violated the Equal Protection Clause, the Supreme Court noted that in-state residents, through taxes, assisted in the production and maintenance of Montana's elk populations. In-state tax revenues provided financial support for game and wildlife programs, highway construction and maintenance, fire protection efforts, and herd preservation and hunter safety programs. *Id.* at 389. Although reaping the benefits, out-of-state hunters did not concomitantly bear any of the tax burden, and therefore Montana was justified in imposing differential license fees. *See id.* at 391.

Schutz argues that *Baldwin* does not apply since the monetary difference between resident and nonresident fees is much greater in Wyoming than it was in Montana. But that argument misses *Baldwin*'s central holding: that there is "no duty on the State to have its licensing structure parallel or identical for both

-18-

residents and nonresidents, or to justify to the penny any cost differential it imposes in a purely recreational, noncommercial, nonlivelihood setting." *Id.* at 391. Thus, in practical application, *Baldwin* discourages courts from interfering with a state's decision to apportion the costs of their wildlife programs between residents and nonresidents.

Furthermore, as with Montana's resident population discussed in *Baldwin*, Wyoming residents "assist[] in the production and maintenance of big-game populations through taxes," *id.* at 389, so the real dollar difference between the costs borne by residents and nonresidents (who pay no taxes) is significantly less than Schutz purports. In any event, it is clear that the fees alone do not reflect the totality of the cost to the State of Wyoming in managing its wildlife, making wild game reasonably accessible to hunters, and regulating the resource's safe and efficient use. Wyoming's "legislative choice was an economic means not unreasonably related to the preservation of a finite resource and a substantial regulatory interest of the State." *Id.* at 390.

In conclusion, Wyoming's Fee and Quota Statutes are rationally related to legitimate state purposes. They therefore are constitutional under the Equal Protection Clause.

## D. Dormant Commerce Clause

Schutz's final claim relates to the effect Wyoming's Fee Statute has on interstate commerce. The Commerce Clause of the U.S. Constitution states that "Congress shall have the power . . . [t]o regulate Commerce with foreign Nations, and among the Several States, and with the Indian tribes." U.S. Const. Art. I, § 8. The Supreme Court has read into this language a "negative" or "dormant" component that grants courts the power to invalidate state regulations that discriminate against interstate commerce. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 571–72 (1997). The essential element of a successful dormant Commerce Clause claim is congressional inaction, so when Congress does act, the dormancy ends, thus leaving the courts obliged to follow congressional will. Such is the case here.

In May, 2005 House Bill 1268 ("HB 1268"), the "Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005," was signed into law by the President. Although seemingly unrelated to the general thrust of the legislation, Section 6063 of HB 1268 specifically addresses the very questions at issue in the present case. Section 6063(b)(1) provides:

> It is the policy of Congress that it is in the public interest for each State to continue to regulate the taking for any purpose of fish and wildlife within its boundaries, including by means of *laws or regulations that differentiate between residents and nonresidents of such State with respect to the availability of licenses* or permits for taking of particular species of fish or wildlife, the kind and numbers

-20-

of fish and wildlife that may be taken, or the fees charged in connection with the issuance of licences or permits for hunting and fishing.

(emphasis added). Section 6063(b)(2) further demonstrates Congress's intent to limit claims like Schutz makes here:

Silence on the part of Congress shall not be construed to impose any barrier under clause 3 of Section 8 or Article I of the Constitution (commonly referred to as the "commerce clause") to the regulation of hunting or fishing by a State or Indian tribe.

Enactment of HB 1268 renders Schutz's dormant Commerce Clause claim moot. Constitutional mootness exists "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *County of Los Angeles v. Davis,* 440 U.S. 625, 631 (1979). This court adheres to the same standard. *See Utah Animal Rights Coalition v. Salt Lake City Corp.,* 371 F.3d 1248, 1257 (10th Cir. 2004); *Citizens for Responsible Gov't State PAC v. Davidson,* 236 F.3d 1174, 1178 (10th Cir. 2000). Thus, when Congress acted to confirm the rights of states to regulate these activities, Schutz's claim ended.

Furthermore, the case and controversy "must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997); *see also Nova Health Sys. v. Gandy*, 388 F.3d 744, 754 (10th Cir. 2004). So even while on appeal, the doctrine of constitutional mootness applies. Congress has unmistakably foreclosed dormant Commerce Clause petitions challenging state hunting and fishing statutes that

-21-

treat nonresidents differently than residents.  We therefore find, and Schutz has conceded, that his claim that the Wyoming statutes are an unconstitutional infringement on interstate commerce is moot due to the enactment of HB 1268, Section 6063. [4]

### III. Conclusion

We hold that Schutz has not suffered an injury sufficiently concrete to create a case or controversy relating to the Guide Statute.  As for the Fee and Quota Statutes, the district court correctly ruled that they do not violate the Equal Protection Clause of the Fourteenth Amendment.  Finally, congressional enactment of HB 1268, Section 6063 makes moot Schutz's Article I, Section 8 claim.  We therefore affirm the judgment of the district court.

---

[4] Prior to the enactment of HB 1268, the Ninth Circuit applied Article I, § 8 to facts very similar to the present case, holding that big game hunting substantially affects interstate commerce and thus should be regulated through judicial application of the dormant Commerce Clause. *Conservation Force, Inc. v. Manning*, 301 F.3d 985, 992–94 (9th Cir. 2002).