# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3012

_____

State of Minnesota, by its Attorney    *
General, Mike Hatch; Collin Peterson;    *
Starkey Grove; Charles Orvik,    *
   *
      Plaintiffs-Appellants,    *
   *   Appeal from the United States
      v.    *   District Court for the
   *   District of North Dakota.
John Hoeven, in his Official Capacity    *
as Governor of the State of North    *
Dakota; Terry Steinwand[1], in his    *
Official Capacity as Director of the    *
North Dakota Game and Fish    *
Department,    *
   *
      Defendants-Appellees.    *

_____

Submitted: March 24, 2006
Filed: August 3, 2006

_____

Before RILEY, BRIGHT, and SMITH, Circuit Judges.

_____

[1]Pursuant to Fed. R. App. P. 43(c)(2), Terry Steinwand is substituted for Dean C. Hildebrand.

BRIGHT, Circuit Judge.

North Dakota law drastically restricts hunting privileges of nonresidents as compared to North Dakota residents. Some of those restrictions have come under attack in this lawsuit as invalid under the United States Constitution. Representatives[2] of the neighboring state of Minnesota (collectively "Minnesota") brought this action against defendants[3], officials of the State of North Dakota (collectively "North Dakota"). The district court[4] rejected the Minnesota claims and granted summary judgment of dismissal in favor of North Dakota. Minnesota appeals. We affirm the judgment but do so in part on grounds other than those relied on by the district court.

## I. BACKGROUND

Tourism ranks as the second-largest and fastest-growing industry in North Dakota, contributing about $3 billion each year to the State's economy. The North Dakota Department of Tourism promotes the State's "legendary hunting and fishing" in its website and advertises through national print, radio, and television media.

About 52,000 nonresidents hunted in North Dakota in 2001, roughly thirty-seven percent of its hunters that year. During 2001, nonresident waterfowl hunters took approximately 36,000 trips to North Dakota, spending an estimated 147,000 days

---

[2]Attorney General, Mike Hatch, for the State of Minnesota, and Minnesota residents Congressman Collin Peterson, Starkey Grove, and Charles Orvik.

[3]John Hoeven, in his capacity as Governor of North Dakota, and Terry Steinwand, in his capacity as Director of the North Dakota Game and Fish Department.

[4]Daniel L. Hovland, Chief Judge, United States District Court for the District of North Dakota.

there. While in North Dakota for the 2001-2002 season, nonresident waterfowl hunters spent around $21 million in direct expenditures such as food, lodging, and equipment. Nonresident hunters also generated an estimated 1,300 full-time jobs, nearly $2 million in North Dakota tax collections, $79 million in gross business volume, and $45 million in secondary economic effects.

In April 2001, an issue arose in the North Dakota Legislative Assembly between resident hunters who wanted restrictions on the hunting of waterfowl by nonresidents and business people who profit from the patronage of nonresident hunters. The Assembly directed the legislative council to study this issue. The assigned committee reported that the number of nonresident waterfowl hunters had grown from about 5,500 hunters in 1990 to 30,000 hunters in 2001. The committee further reported that resident hunters primarily complained about competition they faced from nonresidents in access to hunting land. "[T]here is only so much good hunting land that is available to be acquired for hunting access." (Appellants' J.A. at 430.) The committee recommended restricting nonresident hunting of waterfowl within North Dakota.

Several restrictions on nonresident hunting followed the study, particularly in the hunting of waterfowl. First, North Dakota excluded nonresidents from hunting during the opening week of waterfowl season in "Amendment One to the 2003-2004 Small Game - Furbearer Proclamation," which has the force of law. See N.D. Cent. Code § 20.1-08-01. Second, North Dakota excluded nonresidents from all hunting, including of waterfowl, during the first week of pheasant season on land owned by the North Dakota Game and Fish Department, private land regulated by the Department for hunting purposes, and land for which the Department provides "in lieu of tax" payments. See N.D. Cent. Code § 20.1-08-04.9 (effective August 1, 2003); Amendment One to the 2003-2004 Small Game - Furbearer Proclamation. Third, North Dakota raised its license fees for nonresidents who must now pay $85 for a

waterfowl license (up from $10) and another $85 for a small game[5] license (up from $75) if they also wish to hunt pheasants and grouse. See N.D. Cent. Code § 20.1-03-12 (amended in 2003). By contrast, residents do not have to buy a separate license to hunt waterfowl together with pheasants and grouse, but must only purchase one small game license costing $6. See id.; N.D. Cent. Code § 20.1-03-03. Finally, even before 2003, North Dakota exempted residents and any member of the resident's family residing with the resident to hunt in season without a license on land they own or lease. See N.D. Cent. Code §§ 20.1-03-03, -04(1).

Minnesota filed this action seeking declaratory judgment and to enjoin these hunting laws to the extent they favor North Dakota residents. Minnesota's amended complaint, filed April 12, 2004, alleged among other things that each of these laws violates the Commerce Clause, Art. I, § 8 of the United States Constitution. Further, Minnesota alleged that N.D. Cent. Code §§ 20.1-03-03, -04(1), permitting residents and any member of the resident's family residing with the resident to hunt in season without a license on land they own or lease, violates the Privileges and Immunities Clause, Art. IV, § 2 of the United States Constitution.

On January 27, 2005, Minnesota filed a motion seeking summary judgment on its Commerce Clause claim. On February 25, 2005, North Dakota filed a cross-motion seeking summary judgment on the merits of Minnesota's claims under the Commerce Clause and Privileges and Immunities Clause.

Further, on May 12, 2005, North Dakota filed a motion to dismiss Minnesota's Commerce Clause claim as moot based on the "Reaffirmation of State Regulation of

---

[5]N.D. Cent. Code § 20.1-01-02(45) defines "small game" to include "all game birds and tree squirrels." Section 20.1-01-02(16) defines "game birds" to include "all varieties of geese, brant, swans, ducks, plovers, snipes, woodcocks, grouse, sagehens, pheasants, Hungarian partridges, quails, partridges, cranes, rails, coots, wild turkeys, mourning doves, and crows."

Resident and Nonresident Hunting and Fishing Act of 2005," Section 6063 of House Bill 1268, approved by the United States Congress and signed into law on May 10, 2005.

On June 8, 2005, the district court denied Minnesota's motion for summary judgment, granted North Dakota's cross-motion for summary judgment, and denied North Dakota's motion to dismiss. Minnesota ex rel. Hatch v. Hoeven, 370 F. Supp. 2d 960, 962, 973 (D.N.D. 2005). On Minnesota's Commerce Clause claims, the court reasoned that North Dakota does not regulate "persons in commerce" or activity "substantially affect[ing] interstate commerce." Id. at 969, 971. The court considered it "unnecessary to address the merits of North Dakota's Motion to Dismiss other than to note that Congressional interpretation of what is and is not interstate commerce is not controlling on the judicial branch." Id. at 973 (citing United States v. Lopez, 514 U.S. 549, 557 n.2 (1995)).

On Minnesota's Privileges and Immunities Clause claim, the court considered "the reasoning of the United States Supreme Court . . . in Baldwin [v. Fish & Game Commission of Montana, 436 U.S. 371 (1978)] . . . equally applicable to the current dispute," id. at 967, and dismissed this Minnesota contention.

On July 7, 2005, Minnesota filed a notice of appeal "from the final judgment . . . granting Defendants' Motion for Summary Judgment and denying Plaintiffs' Motion for Summary Judgment."[6]

---

[6]The States of South Dakota, Alaska, Colorado, Kansas, Montana, Nebraska, Nevada, Utah, and Wyoming have jointly filed an *amicus curiae* brief in support of North Dakota. These states are among the many states, including Minnesota, which extend residents preferred access to hunting and fishing opportunities. See, e.g., Alaska Stat. § 16.05.255(d) (Michie 2004) (granting preference to residents in the taking of moose, deer, elk and caribou); Ariz. Admin. Code § R12-4-114 (2005) (restricting hunting of buffalo and bighorn sheep by nonresidents); Cal. Fish & Game Code §§ 331(a), 332(b) (2005) (limiting licenses for antelope and elk to residents

only); 2 Colo. Code Regs. § 406-2 (2006) (limiting licenses for nonresident hunters to no more than ten percent of available moose, bighorn sheep, and mountain goat licenses); Fla. Admin. Code Ann. r. 68A-5.005 (2006) (limiting nonresidents to ten percent of special-opportunity hunting permits); Idaho Code § 36-408(2) (Michie 2005) (authorizing Fish and Game Commission to limit or prohibit nonresidents from participation in controlled hunts); Ill. Admin. Code tit. 17, § 670.20 (2005) (limiting the number of nonresident archery deer permits); Iowa Code Ann. §§ 483A.7, 483A.8 (West 2006) (limiting the number of nonresident turkey and deer permits); Kan. Stat. Ann. § 32-937(l) (2005) (limiting the number of nonresident deer permits); Me. Rev. Stat. Ann. tit. 12, §§ 11152(3), 11154(2) (West 2006) (limiting the number of nonresident licenses for antlerless deer and moose); Md. Code Ann. Nat. Res. §§ 10-604(f), 10- 605(d), 606(e) (2006) (restricting hunting of waterfowl by nonresidents); Minn. Stat. § 97A.475(1)-(3) (2006) (limiting moose, elk, and prairie chicken licenses to residents only); Mont. Code Ann. § 87-2-506(2) (2005) (limiting nonresidents to ten percent of big game licenses when applications exceed the number to be issued); Neb. Rev. Stat. § 37-447(5) (2006) (authorizing deer hunting permits for nonresidents after preference has been given to resident hunters); Neb. Rev. Stat. §§ 37.450 (2006) (restricting elk permits to residents); Nev. Rev. Stat. § 502.147 (2005) (limiting the number of nonresident deer tags); Nev. Rev. Stat. § 502.250 (2005) (establishing different fees for resident and nonresident hunting; for example, a resident deer tag costs $30 while a nonresident deer tag costs $240); N.H. Code Admin. R. Ann. Fish 301.09(1)(2)(f) (2006) (limiting the number of nonresident moose permits); N.M. Stat. Ann. § 17-3-16 (2006) (limiting nonresidents to twenty-two percent of the licenses for hunting on public lands); N.Y. Envtl. Conserv. Law § 11-0913 (McKinney 2006) (authorizing resident preference for deer permits); Or. Rev. Stat. § 497.112(1), (7), (8), (9) (2005) (limiting number of nonresident tags in controlled hunts for mountain goat, mountain sheep, black bear, cougar, antelope, elk, and deer and establishing different tag fees for residents and nonresidents); S.D. Codified Laws § 41-6-18.1 (2005) (limiting ten-day nonresident waterfowl licenses to four thousand per year); S.D. Codified Laws § 41-6-18.4 (2005) (restricting areas in which nonresidents may hunt with three-day waterfowl licenses); S.D. Codified Laws § 41-6-19.3 (2005) (granting preference to certain resident landowners and lessees for deer and antelope permits); 2005 Utah Big Game Proclamation (restricting nonresident hunting permits as compared to residents and charging greater permit fees), *available at* http://www.wildlife.utah.gov/proclamations/2005_biggame/; Vt. Stat. Ann. tit. 10 § 4081(g)(2) (2005) (limiting nonresidents to ten percent of antlerless

Minnesota on its appeal raises two issues: (1) that North Dakota's waterfowl hunting restrictions violate the dormant Commerce Clause, Art. I, § 8, of the United States Constitution (Appellants' Op. Br. at 25), and (2) North Dakota's authorizing residents to hunt in season on land they own or lease without a license denies nonresident landowners the same use and enjoyment of their property in violation of the Privileges and Immunities Clause, Art. IV, § 2, of the United States Constitution (Appellants' Op. Br. at 16, 20-21).

North Dakota in response rejects the dormant Commerce Clause contentions and separately denies the Privileges and Immunities Clause claim. North Dakota asserts that an enactment by the United States Congress, House Bill 1268, in May 2005, renders the dormant Commerce Clause claim constitutionally moot. North Dakota in this appeal also asserts that Minnesota has waived the Privileges and Immunities Clause claim, and alternatively that Minnesota's claim does not impinge on a privilege or immunity protected by Article IV, Section 2 of the United States Constitution.

In this opinion, we briefly discuss the dormant Commerce Clause issue and determine that United States Congressional action has made Minnesota's contention constitutionally moot. We reach and discuss the Privileges and Immunities Clause and determine its provisions do not provide Minnesota any relief. Thus, we will affirm the judgment of dismissal.

---

deer permits); W. Va. Code § 20-2-42n (2006) (establishing different fees for hunting of antlerless deer by residents and nonresidents); Wis. Stat. §§ 29.164(3), 29.177(5) (2005) (establishing resident preference categories for awarding deer and wild turkey licenses); Wyo. Admin. Code Game Hunt Ch. 6 § 5 (2005) (establishing quotas for nonresident deer licenses).

## II. DISCUSSION

We review *de novo* a district court's grant of summary judgment. <u>Donovan v. Harrah's Md. Heights Corp.</u>, 289 F.3d 527, 528 (8th Cir. 2002). Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### A. Commerce Clause, Art. I, § 8

Minnesota claims that North Dakota's preference for residents over nonresidents in its hunting laws violates the Commerce Clause, Art. I, § 8, of the United States Constitution. The Commerce Clause provides, "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. Art. I, § 8.

Although the Commerce Clause reads as an affirmative grant of regulatory power to Congress, the Supreme Court has read into this language a "negative" or "dormant" component that grants courts the power to invalidate state laws that discriminate against interstate commerce. See <u>Camps Newfound/Owatonna, Inc. v. Town of Harrison</u>, 520 U.S. 564, 571-72 (1997). A dormant Commerce Clause analysis asks whether the state's law discriminates against interstate commerce and whether sufficient justification exists for the burden imposed. See <u>Smithfield Foods, Inc. v. Miller</u>, 367 F.3d 1061, 1065 (8th Cir. 2004).

The record in this case clearly shows nonresident hunting means big business for North Dakota and its residents. However, we need not reach the merits of Minnesota's claim that North Dakota's restrictions on nonresident hunting violate the dormant Commerce Clause.

On May 10, 2005, the President signed into law House Bill 1268, the "Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005." Although seemingly unrelated to the general thrust of the legislation, Section 6063 of House Bill 1268 specifically addresses the issue raised in this appeal, providing:

> (a) SHORT TITLE. – This section may be cited as the "Reaffirmation of State Regulation of Resident and Nonresident Hunting and Fishing Act of 2005".
> (b) Declaration of Policy and Construction of Congressional Silence –
> (1) IN GENERAL. – It is the policy of Congress that it is in the public interest for each State to continue to regulate the taking for any purpose of fish and wildlife within its boundaries, including by means of laws or regulations that differentiate between residents and nonresidents of such State with respect to the availability of licenses or permits for taking of particular species of fish or wildlife, the kind and numbers of fish and wildlife that may be taken, or the fees charged in connection with issuance of licenses or permits for hunting or fishing.
> (2) CONSTRUCTION OF CONGRESSIONAL SILENCE. – Silence on the part of Congress shall not be construed to impose any barrier under clause 3 of Section 8 of Article I of the Constitution (commonly referred to as the "commerce clause") to the regulation of hunting or fishing by a State or Indian tribe.

In Schutz v. Thorne, 415 F.3d 1128, 1130, 1137-38 (10th Cir. 2005), the Tenth Circuit considered the effect of Section 6063 on a dormant Commerce Clause challenge to Wyoming giving residents preferred access to recreational hunting. The court concluded Section 6063 made the claim constitutionally moot, which results "'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" Id. at 1138 (quoting County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)). The court explained that "[t]he essential element of a successful dormant Commerce Clause claim is congressional inaction, so when Congress does act, the dormancy ends, thus leaving the courts obliged to follow

-9-

congressional will." Id. "Thus, when Congress acted to confirm the rights of states to regulate these activities, Schutz's claim ended." Id.

We agree with the Tenth Circuit's reasoning. Minnesota's dormant Commerce Clause claim ended with the passage of the "Reaffirmation of State Regulation of Resident and Nonresident Hunting and Fishing Act of 2005."[7] See id.; also Republican Party of Minn. v. Klobuchar, 381 F.3d 785, 790 (8th Cir. 2004) ("Federal courts are not empowered to give opinions upon moot questions . . . .") (internal quotations omitted).

The district court misread United States v. Lopez, 514 U.S. 549 (1995), reasoning "Congressional interpretation of what is and is not interstate commerce is not controlling on the judicial branch." See Hoeven, 370 F. Supp. 2d at 973. Lopez did not challenge state law under the dormant Commerce Clause. Rather, Lopez presented a "positive" Commerce Clause challenge, asking whether Congress regulated beyond the scope of its authority in passing the Gun-Free School Zones Act of 1990. See 514 U.S. at 551. On that question, the Supreme Court reasoned that

---

[7]We do not decide whether North Dakota should have cross-appealed the denial of its motion to dismiss this claim as moot. As Schutz observed, "the case and controversy 'must be extant at all stages of review, not merely at the time the complaint is filed.'" 415 F.3d at 1138 (quoting Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997)). We also note that prior to the enactment of House Bill 1268, courts had disagreed on whether restricting nonresident hunting in favor of residents discriminates against interstate commerce. Compare Conservation Force, Inc. v. Manning, 301 F.3d 985, 988, 1000 (9th Cir. 2002) (concluding Arizona's restrictions on nonresident hunting substantially affected and discriminated against interstate commerce and remanding for the district to decide whether the restrictions had the requisite justification) with Schutz v. Wyoming, No. 02-CV-165-D (D. Wyo. May 29, 2003) (concluding the Ninth Circuit wrongly decided Conservation Force and "the dormant Commerce Clause [did] not appl[y] to Wyoming's big game statutes").

Congress could not decide the outer limits of its power to regulate interstate commerce.  See id. at 556-58 & n.2.

With respect to the dormant Commerce Clause, the Supreme Court has held,

> Our decisions do not, however, limit the authority of Congress to regulate commerce among the several States as it sees fit.  In the exercise of this plenary authority, Congress may "confe[r] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy."  If Congress ordains that the States may freely regulate an aspect of interstate commerce, any action taken by a State within the scope of the congressional authorization is rendered invulnerable to Commerce Clause challenge.

Western & Southern Life Ins. Co. v. State Bd. of Equalization of Cal., 451 U.S. 648, 652-53 (1981) (internal citations omitted).  The district court need not have reached the merits of Minnesota's claim under the dormant Commerce Clause.  We make it crystal clear that we do not reach nor decide the merits of the dormant Commerce Clause issue in this case.

Minnesota also contends that Section 6036 does not apply to migratory waterfowl passing through North Dakota.  This argument contradicts the plain meaning of Section 6036, which states, "It is the policy of Congress that it is in the public interest for each State to continue to regulate the taking for any purpose of fish and wildlife within its boundaries . . . ."  Further, Minnesota did not develop this argument and define "boundaries" in a way that excludes migratory wildlife located by hunters in North Dakota.  Instead, Minnesota simply commented that North Dakota does not "own" or "possess" migratory waterfowl.

Finally, Minnesota argues Congress did not follow the regular authorization process by attaching Section 6036 to an important appropriations bill.  As part of an appropriations bill, Minnesota argues that Section 6036 provided a temporary measure that lasted for one fiscal year, at most.  This argument loses force where, as here, the

disputed section does not relate to appropriations and spending, which generally occurs in a fiscal cycle. Cf. Bldg. & Constr. Trades Dep't, AFL-CIO v. Martin, 961 F.2d 269, 274 (D.C. Cir. 1992) ("[A] provision contained in an appropriations bill operates only in the applicable fiscal year, unless its language clearly indicates that it is intended to be permanent."); United States v. Int'l Bus. Machines Corp., 892 F.2d 1006, 1008-09 (Fed. Cir. 1989).

To bolster its argument, Minnesota observes that Section 6036 has not been codified in the United States Code and the conference report on House Bill 1268 expressed a need for expedient action, stating "State fish and wildlife agencies will soon be considering regulations for coming seasons, and it is important that questions about their authority be resolved without unnecessary delay." 151 Cong. Rec. H2997-02, at 3023 (2005). However, we need not decide today whether Section 6036 will forever preclude challenges to restrictions on nonresident hunting under the dormant Commerce Clause. It is sufficient for this court to determine its application to this litigation.

We have no doubt Congress intended Section 6036 to apply here. Section 6036 arose in response to Conservation Force, Inc. v. Manning, 301 F.3d 985 (9th Cir. 2002). See 151 Cong. Rec. H2997-02, at 3023 (2005). The committee report expressed concern that the Ninth Circuit's decision "could have an effect on the thinking of Federal courts across the country." Id.

As the district court observed, Minnesota modeled its dormant Commerce Clause claim after Conservation Force. See 370 F. Supp. 2d at 971. Then, while the parties had motions for summary judgment on the issue pending before the district court, the President signed Section 6036 into law as part of House Bill 1268. In this context, the language of futurity contained in Section 6036 certainly applies. See § 6036(b)(1) ("It is the policy of Congress that it is in the public interest for each State to continue to regulate the taking for any purpose of fish and wildlife within its boundaries, including by means of laws or regulations that differentiate between

-12-

residents and nonresidents of such State . . . .") (emphasis added); § 6036(b)(2) ("Silence on the part of Congress shall not be construed to impose any barrier under clause 3 of Section 8 of Article I of the Constitution (commonly referred to as the 'commerce clause') to the regulation of hunting or fishing by a State or Indian tribe.") (emphasis added).

## B. Privileges and Immunities Clause, Art. IV, § 2

Minnesota also claims that North Dakota's statutes authorizing residents to hunt without a license on land they own or lease violates the Privileges and Immunities Clause, Art. IV, § 2, of the United States Constitution, which states, "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."[8]

Whether differential treatment of out-of-state residents violates this Clause involves a two-part inquiry: (1) whether the state's law discriminates against out-of-state residents with regard to a privilege or immunity protected by the Clause, and (2) if so, whether sufficient justification exists for the discrimination. See United Bldg. & Constr. Trades Council of Camden County & Vicinity v. Mayor & Council of the City of Camden, 465 U.S. 208, 218, 221-23 (1984). We do not reach the second prong.

In Baldwin v. Fish & Game Commission of Montana, 436 U.S. 371 (1978), the Supreme Court considered whether Montana's preference for residents in access to recreational elk hunting violated the Privileges and Immunities Clause. The Court explained the limited reach of this constitutional provision, "Only with respect to

---

[8]We note that we address this issue, although not briefed by Minnesota in the district court. Minnesota raised this Privileges and Immunities claim in its amended complaint, North Dakota briefed the issue with its motion for summary judgment, and the district court ruled on the claim. See Struempler v. Bowen, 822 F.2d 40, 42 (8th Cir. 1987); Harrell v. 20th Century Ins. Co., 934 F.2d 203, 206 n.1 (9th Cir. 1991).

those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally." Id. at 383. The Court's rationale and decision are instructive here,

> Elk hunting by nonresidents in Montana is a recreation and a sport. In itself–wholly apart from license fees–it is costly and obviously available only to the wealthy nonresident or to the one so taken with the sport that he sacrifices other values in order to indulge in it and to enjoy what it offers. It is not a means to the nonresident's livelihood. The mastery of the animal and the trophy are the ends that are sought; appellants are not totally excluded from these. The elk supply, which has been entrusted to the care of the State by the people of Montana, is finite and must be carefully tended in order to be preserved.
> 　　Appellants' interest in sharing this limited resource on more equal terms with Montana residents simply does not fall within the purview of the Privileges and Immunities Clause. Equality in access to Montana elk is not basic to the maintenance or well-being of the Union. Appellants do not–and cannot–contend that they are deprived of a means of a livelihood by the system or of access to any part of the State to which they may seek to travel. We do not decide the full range of activities that are sufficiently basic to the livelihood of the Nation that the States may not interfere with a nonresident's participation therein without similarly interfering with a resident's participation. Whatever rights or activities may be "fundamental" under the Privileges and Immunities Clause, we are persuaded, and hold, that elk hunting by nonresidents in Montana is not one of them.

Id. at 388.

Just like Montana elk hunting, waterfowl hunting in North Dakota is a recreation and a sport. Waterfowl hunting does not provide a means to the nonresident's livelihood. Equality in access to North Dakota waterfowl does not constitute a fundamental right basic to the maintenance or well-being of the Union.

Minnesota recognizes Baldwin's authority but seeks to distinguish the Court's precedent through a property rights' analysis. Baldwin stated that the Privileges and

-14-

Immunities Clause protects rights "in the ownership and disposition of privately held property within the State."  436 U.S. at 383 (citing <u>Blake v. McClung</u>, 172 U.S. 239 (1898)). Minnesota contends that North Dakota interferes with nonresidents' property rights by preventing nonresidents who own or lease land in North Dakota from hunting on their land on the same terms enjoyed by resident owners and lessees. <u>Baldwin</u> did not address whether hunting constitutes a stick in the bundle of property rights accompanying land ownership.

We look to North Dakota law in deciding whether the purchase or lease of land within the State confers a property right to hunt on that land.  <u>See</u> <u>Bd. of Regents of State Colleges v. Roth</u>, 408 U.S. 564, 577 (1972) ("Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law–rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."); <u>Clajon Prod. Corp. v. Petera</u>, 70 F.3d 1566, 1575-76 (10th Cir. 1995) (reviewing Wyoming law on "whether a landowner has a property right to hunt surplus game that may be found on his or her land"); <u>State v. Butler</u>, 587 So. 2d 1391, 1392 (Fla. Dist. Ct. App. 1991) ("Whether there is a property interest in wildlife is a matter of state law.  <u>See</u> <u>Davis v. Scherer</u>, 468 U.S. 183 (1984).").

"At common law, a landowner traditionally had the right to hunt wild animals on his or her land." <u>Clajon</u>, 70 F.3d at 1575.  North Dakota, by contrast, commits the hunting and taking of wildlife to State regulation for the public good. <u>See</u> N.D. Const. Art. XI, § 27; N.D. Cent. Code § 20.1-01-03.  The statutes prescribe a procedure by which the State establishes the manner, places, and times in which each species of wildlife may be taken or possessed and in what numbers.  <u>See</u> N.D. Cent. Code § 20.1-08-04.  Further, except under certain statutory exceptions, residents and nonresidents may not hunt or fish within North Dakota without a statutorily prescribed license.  <u>See</u> N.D. Cent. Code. §§ 20.1-03-03, -07.

The Supreme Court of North Dakota has affirmed the authority of this statutory scheme, which places hunting and fishing in the arms of the State. See State ex rel. Stuart v. Dickinson Cheese Co., 200 N.W.2d 59, 61 (N.D. 1972) ("As sovereign, the State has the power to determine when and under what conditions fish running wild may be taken and thus reduced to ownership . . . ."); State v. Hastings, 41 N.W.2d 305, 308 (N.D. 1950) ("From a consideration of the foregoing statutes it is apparent that no person in this state can acquire title to or the right to sell muskrat pelts unless such pelts are those of animals taken in open season and that pelts of animals taken out of season are subject to seizure by the state or are contraband as alleged in the information.").

We recognize that North Dakota Century Code § 20.1-03-04 provides, "Any resident, or any member of the resident's family residing customarily with the resident, may hunt small game, fish, or trap during the open season without a license upon land owned or leased by the resident." However, this statute does not discriminate against nonresidents with respect to a fundamental right existing in property. Rather, it discriminates against nonresident participation in recreational hunting, which the United States Constitution does not protect under Article IV, § 2.

The limited authorization to hunt without a license provided under this statute comes as a matter of legislative grace in connection with the general prohibition against residents hunting without a license. See N.D. Cent. Code § 20.1-03-03 (stating no resident may hunt without a license except as provided in § 20.1-03-04). If the resident property owner violates certain laws, the State may revoke the resident's hunting privileges. See N.D. Cent. Code § 20.1-01-26 (stating hunting privileges may be suspended upon conviction under this title [, Game, Fish, Predators, and Boating]); § 20.1-01-26.1 (stating no person may hunt while the person's hunting privileges are suspended). Further, Section 20.1-03-04 confers no rights upon the resident should North Dakota decide to revoke this exception and require a license for all hunting within the State.

Minnesota refers us to <u>Paul v. Virginia</u>, 75 U.S. 168, 180 (1868); <u>Corfield v. Coryell</u>, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823) (No. 3230); and <u>Blake v. McClung</u>, 172 U.S. 239, 258 (1898). Consistent with <u>Baldwin</u>, these cases recognize that the Privileges and Immunities Clause protects property rights. However, they do not establish hunting constitutes a part of the bundle of property rights accompanying the ownership or lease of land.

## III. CONCLUSION

For the reasons stated above, we affirm the district court's entry of judgment for the defendants.[9]

———————————————

[9]As stated in the opinion, we did not address the merits of Minnesota's dormant Commerce Clause claim because of the mootness "safe harbor" resulting from action of the United States Congress. The application of the "safe harbor" for the future also has not been reached. In light of the uncertainties, the state officials in Minnesota and North Dakota may well consider discussing the issue and seeking a satisfactory resolution, rather than litigating further.